**REGISTER.COM, INC., Plaintiff,**

v.

**VERIO, INC., Defendant.**

**No. 00 CIV. 5747(BSJ).**

United States District Court,
S.D. New York.

Dec. 8, 2000.

Kenneth A. Plevan, Scott D. Brown, Skadden, Arps, William F. Patry, New York City, for Plaintiff Register.com.

Michael A. Jacobs, James E. Hough, Morrison Foerster, New York City, for Defendant Verio.

### Order

JONES, District Judge.

#### Introduction

Plaintiff Register.com, a registrar of Internet domain names, moves for a preliminary injunction against the defendant, Verio, Inc. ("Verio"), a provider of Internet services. Register.com relies on claims under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); the Computer Fraud and Abuse Act of 1986, 18 U.S.C. § 1030, as amended; as well as trespass to chattels and breach of contract under the common law of the State of New York. In essence Register.com seeks an injunction barring Verio from using automated software processes to access and collect the registrant contact information contained in its WHOIS database and from using any of that information, however accessed, for mass marketing purposes.

### I.   Findings of Fact

#### The Parties

Plaintiff Register.com is one of over fifty domain name registrars for customers who wish to register a name in the .com, .net, and .org top-level domains. As a registrar it contracts with these second-level domain ("SLD") name holders and a registry, collecting registration data about the SLD holder and submitting zone file information for entry in the registry database. In addition to its domain name registration services, Register.com offers to its customers, both directly and through its more than 450 co-branded and private label partners, a variety of other related services, such as (i) web site creation tools; (ii) web site hosting; (iii) electronic mail; (iv) domain name hosting; (v) domain name forwarding, and (vi) real-time domain name management. Register .com has invested over $15 million dollars in equipment, software, service fees, and human resources in designing, developing, and maintaining its website and the computer systems necessary to host Register.com's Internet-based services. (*See* Gardos Decl. ¶ 6). It has also spent in excess of $25 million on advertising and brand promotion in the year 2000 alone, including through print, radio, and television media. (*See* Mornell Decl. ¶ 31).

In order to give its customers control over their receipt of commercial solicitations, Register.com provides them with the opportunity to "opt-in" during the domain name registration process to receiving sales and marketing communications from Register.com or its co-brand or private label partners. Customers who do not opt-in to such communications are not solicited by Register.com or its co-brands. Significantly, Register.com's co-brand and private label partners have contracted with Register.com for the right to have their services featured on the *www.register.com* website. (*See* Mornell Decl. ¶ 18).

Defendant Verio is one of the largest operators of web sites for businesses and a leading provider of comprehensive Internet services. Although not a registrar of domain names, Verio directly competes with Register.com and its partners to provide registration services and a variety of other Internet services including website hosting and development. Verio recently made a multimillion dollar investment in its computer system and facilities for its expanded force of telephone sales associates in its efforts to "provide recent domain name registration customers with the services they need, at the time they need them." (Eden Decl. ¶ 31).

### The WHOIS database

To become an accredited domain name registrar for the .com, .net, and .org domains, all registrars, including Register.com are required to enter into a registrar   Accreditation   Agreement ("Agreement") with the Internet Corporation for Assigned Names and Num-

bers ("ICANN").[1] Under that Agreement, Register.com, as well as all other registrars, is required to provide an online, interactive WHOIS database. This database contains the names and contact information—postal address, telephone number, electronic mail address and in some cases facsimile number—for customers who register domain names through the registrar. The Agreement also requires Register.com to make the database freely accessible to the public via its web page and through an independent access port called port 43. These query-based channels of access to the WHOIS database allow the user to collect registrant contact information for one domain name at a time by entering the domain name into the provided search engine.[2]

The primary purpose of the WHOIS database is to provide necessary information in the event of domain name disputes, such as those arising from cybersquatting or trademark infringement. (*See* Rony Decl. ¶ 18, Ex. B to McPherson Decl. at 13). The parties also agree that the WHOIS data may be used for market research.

Specifically, section II.F.5 of Register.com's Accreditation Agreement with ICANN requires that:

In providing query-based public access to registration data as required by Sections II.F.1 and II.F.4, Registrar shall not impose terms and conditions on use of the data provided except as permitted by ICANN-adopted policy. Unless and until ICANN adopts a different policy, Registrar shall permit use of data it provides in response to queries *for any lawful purposes except to:* (a) *allow, enable, or otherwise support the transmission of mass unsolicited, commercial advertising or solicitations via e-mail (spam);* or (b) enable high volume, automated, electronic processes that apply to Registrar (or its systems).

(Ex. E to McPherson Decl.) (emphasis added).

Originally Register.com's terms and conditions for users of its WHOIS database were substantially the same. In April 2000, however, Register.com implemented the following more restrictive terms of use governing its WHOIS database:

By submitting a WHOIS query, you agree that you will use this data *only for lawful purposes* and that, *under no circumstances will you use this data to:* (1) *allow, enable, or otherwise support the transmission of mass unsolicited, commercial advertising or solicitations **via direct mail**, electronic mail, **or by telephone**;* or (2) enable high volume, automated, electronic processes that apply to Register.com (or its systems). The compilation, repackaging, dissemination or other use of this data is expressly prohibited without the prior

---

1. ICANN was created in 1998 to assume the U.S. Government's responsibilities for the management of the Internet Domain Name System ("DNS"). It is a private, not-for-profit corporation initiated by the Department of Commerce to privatize the Domain Name System in a manner that increases competition and facilitates international participation in its management. (*See* Ex. B to McPherson Decl.). Network Solutions, Inc. ("NSI") formerly enjoyed a monopoly as the only domain name registrar. NSI still operates and maintains the top-level domain name servers and zone files which enable the other registrars to access the DNS and to transmit domain name registration information for the .com, .net, and .org top level domain names to the System.

2. The Agreement also obligates Register.com to provide third parties with bulk access to the same WHOIS data pursuant to a license agreement. The bulk access license entitles the licensee to receive weekly—in one transmission—an electronic copy of the same WHOIS information that is provided continuously through Register.com's web page and its access port 43. The Agreement allows Register.com to charge a $10,000 yearly fee for the license. Register.com has imposed the same mass marketing prohibition on the use the bulk license data. (*See* Eden Depo. at 34).

written consent of Register.com. Register.com reserves the right to modify these terms at any time. By submitting this query, you agree to abide by these terms.

(Ex. 27 to Pl.'s Sept. 8, 2000 Motion)(emphasis added).[3]

### Verio's Project Henhouse

In late 1999, to better target their marketing and sales efforts toward customers in need of web hosting services and to reach those customers more quickly, Verio developed an automated software program or "robot."[4] With its search robot, Verio accessed the WHOIS database maintained by the accredited registrars, including Register.com, and collected the contact information of customers who had recently registered a domain name. Then, despite the marketing prohibitions in Register.com's terms of use, Verio utilized this data in a marketing initiative known as Project Henhouse and began to contact and solicit Register.com's customers, within the first several days after their registration, by e-mail, regular mail, and telephone.

### Verio's Search Robots

In general, the process worked as follows: First, each day Verio downloaded, in compressed format, a list of all currently registered domain names, of all registrars, ending in .com, .net, and .org. That list or database is maintained by Network Solutions, Inc. ("NSI") and is published on 13 different "root zone" servers. The registry list is updated twice daily and provides the domain name, the sponsoring registrar, and the nameservers for all registered names. Using a computer program, Verio then compared the newly downloaded NSI registry with the NSI registry it downloaded a day earlier in order to isolate the domain names that had been registered in the last day and the names that had been removed. After downloading the list of new domain names, only then was a search robot used to query the NSI database to extract the name of the accredited registrar of each new name.[5] That search robot then automatically made successive queries to the various registrars' WHOIS databases, via the port 43 access channels, to harvest the relevant contact information for each new domain name registered. (*See* Eden Depo. at 26–30; Eden Decl. ¶¶ 36–38). Once retrieved, the WHOIS data was deposited into an information database maintained by Verio. The resulting database of sales leads was then provided to Verio's telemarketing staff.

### Marketing History

Beginning in January, 2000, Register.com learned that Verio was e-mailing its customers to solicit business. Register.com through its Director of Strategic Initiatives Lauren Gaviser complained to Eric Eden, Director of Sales and Channel Operations of Verio, citing an e-mail received by a customer which identified Verio as the sender but stated "[b]y now you

---

**3.** ICANN in its amicus submission dated September 22, 2000 through Louis Touton, its General Counsel, stated that:

> To the extent that Register.com is using this legend to restrict otherwise lawful use of the data for mass unsolicited, commercial advertising or solicitations by direct mail or telephone (and not just by electronic mail), it is ICANN's position that Registrar.com (sic) has failed to comply with the promise it made in Section II.F.5 of the Registrar Accreditation Agreement.

(ICANN Amicus Br. at 11).

**4.** Before the development of its search robot, Verio relied primarily on banner and print ads, and briefly on predictive dialing in its marketing efforts. Under the predictive dialing approach, Verio purchased potential customer leads, then contacted those leads by telephone, using a computer dialer and connecting the call to a telemarketer when a potential customer answered. (See Ayers Depo. at 33–34, 75–76).

**5.** Although Register.com and ICANN have also criticized Verio's use of its search robot to collect the registrar names from NSI's computer system (*see* ICANN Amicus Br. at 15), that issue is not before the Court.

should have received an email from us confirming the registration of your domain name(s) ... you have taken the first step towards having your own website ... the next step is to set up a hosting account ..." (Ex. 4 to Pl.'s Sept. 8, 2000 Motion). Gaviser advised Eden that the e-mail had misled the customer into thinking that Verio had an affiliation with or sponsorship from Register.com. (*See* Ex. 5 to Pl.'s Sept. 8, 2000 Motion). Eden replied that "our intention is not to mislead people. The e-mail that was sent resulted from a system problem." *Id.* He promised to correct it.

Register.com continued to get complaints about e-mail and telephone solicitations by Verio from its customers and co-brand partners through January. In March 2000 Gaviser again contacted Eden to complain that Register.com was still receiving numerous complaints, including that a number of telephone messages similar to the following were left with Register.com customers: "This is [name of tele-marketer] calling from Verio regarding the registration of [customer's domain name]. Please contact me at your earliest convenience." (Ex. 44 to Pl.'s Sept. 8, 2000 Motion).

On May 5, 2000 Register.com's lawyers wrote to Verio's General Counsel requesting that Verio immediately cease and desist from this marketing conduct. Register.com complained generally that the use of its mark as well as the timing of the solicitations was harming its good will and specifically warned Verio that it was violating the terms of use it had agreed to in submitting its WHOIS queries by sending "mass unsolicited, commercial advertising or solicitations via e-mail (spam)." (Ex. E to McPherson Decl.).

On May 9, 2000 Verio, through an Associate Counsel, communicated that it had stopped using the Register.com mark or any other similar mark or phrase which would lead to confusion and had ceased accessing the WHOIS database for the purpose of marketing through e-mail. (*See* Ex. 7 to Pl.'s Sept. 8, 2000 Motion).

In an effort to confirm settlement of the dispute, Register.com's lawyers sent Verio a terms letter for it to sign and acknowledge. In that letter Register.com specifically required Verio to cease use of the WHOIS database for not just e-mail marketing, but also direct mail and telemarketing. Verio refused to sign and although it ceased e-mail solicitation, it continued to use the WHOIS contact information for telemarketing purposes into July 2000. (*See* Ex. 14 to Pl.'s Sept. 8, 2000 Motion, Ayers Depo. at 56).

Accordingly, Register.com commenced this lawsuit and moved for a temporary restraining order and preliminary injunction on August 3, 2000. On August 4, 2000, Verio sought expedited discovery and agreed on August 9, 2000 to enter into a stipulated temporary restraining order with Register.com which prevents it from accessing Register.com's WHOIS database by using a search robot and prevents Verio from using any data obtained from Register.com to solicit Register.com's customers. Prior to the Court's September 15, 2000 hearing, the Court asked ICANN to submit an *amicus curiae* brief outlining its position with respect to the parties' dispute. The Court granted the parties' request to respond to ICANN's brief, which responses were received on September 28, 2000.

## II.  Discussion

This dispute centers on both Verio's end use of the WHOIS data and its use of the automated search robot. While Register.com acknowledges its obligation to provide public access to its customers' contact information, it has developed "terms of use" which prohibit third parties, such as Verio, from using the contact information for any mass marketing purpose—whether by e-mail, regular mail or telephone. Register.com also argues that the use of automated software to access the WHOIS database violates its terms of use and harms its computer systems.

Verio admits both the use of the WHOIS data for marketing purposes and the use of the search robot. Verio also concedes that its end use of the information violates the marketing restriction imposed by Register.com, but argues that this restriction should not be enforced because—at a minimum—direct mail and telephone marketing are permissible uses under the terms of the Accreditation Agreement Register.com signed with ICAAN.[6] Verio argues that by imposing these impermissible anti-marketing restrictions Register.com is in breach of that Agreement. Verio also argues that the use of the robot is not prohibited by Register.com's terms of use and claims that Register.com has not proven that the robot causes any harm, let alone irreparable harm, to Register.com's computer systems.

### III. Standard For Injunctive Relief

In order to obtain a preliminary injunction, a plaintiff must demonstrate both (1) that it will suffer irreparable harm if the motion is not granted and (2) either (a) a likelihood that it will succeed on the merits of the action or (b) a sufficiently serious question going to the merits of the litigation and the balance of hardships tipping decidedly in plaintiff's favor. *See L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co.,* 79 F.3d 258, 261–62 (2d Cir.1996).

The purpose of a preliminary injunction is to keep the parties, while the suit is pending, as much as possible in the respective positions they occupied when the suit began and to preserve the Court's ability to render a meaningful decision after a trial on the merits. *See WarnerVision Entertainment v. Empire of Carolina, Inc.,* 101 F.3d 259, 261–62 (2d Cir.1996).

A preliminary injunction is an extraordinary and drastic measure that should not be routinely granted, *see Mazurek v. Armstrong,* 520 U.S. 968, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997), because it is "one of the most drastic tools in the arsenal of judicial remedies." *Hanson Trust PLC v. SCM Corp.,* 774 F.2d 47, 60 (2d Cir.1985). The granting of a preliminary injunction is within the equitable discretion of the trial judge. *Societe Comptoir De L'Industrie Cotonniere Etablissements Boussac v. Alexander's Dep't Stores, Inc.,* 299 F.2d 33 (2d Cir.1962).

### IV. Register.com's Claims

The heart of Verio's defense is that this Court should refuse to enforce Register.com's terms of use. Accordingly, the Court turns to a discussion of Register.com's breach of contract claim.

### A. *Breach of Contract*

■ Register.com imposes conditions on the access to and end use of data contained in its WHOIS database. It publishes those terms of use on the home page of its Internet website and conditions entry into the WHOIS database on assent to those terms. As noted above, Verio concedes that it violated Register.com's posted restriction on the use of WHOIS data for direct mail and telephone marketing purposes. Verio contends however that violating Register.com's restrictions on the use of WHOIS data for marketing purposes did not constitute a breach of contract for two reasons. First, Verio argues that the promises Register.com made to ICANN in the Agreement have created a privilege in Verio to access the WHOIS database, and that it may interpose the Agreement as a defense to any claim by

---

**6.** Verio contests Register.com's assertion that its particular use of e-mail to solicit Register.com's customers constitutes the "spamming" that is prohibited by the ICANN agreement. The Court need not determine whether Verio' e-mails constitute "spam" because it is Register.com's terms of use, rather than ICANN's, that are at issue here. Register.com's terms do not specifically prohibit "spam", but rather simply prohibit the use of

WHOIS data for mass, unsolicited e-mail. Verio's e-mails clearly violate Register.com's terms of use. Verio's unsolicited e-mail solicitations are "mass" by any definition of the term. Even though the e-mails are not sent simultaneously with one mouse click, as Verio argues, they are sent in massive quantities over a short period of time, and thus fit the definition of "mass" e-mails.

Register .com that Verio violated an access or use restriction broader than those permitted in the Accreditation Agreement. Second, Verio argues that even if Register.com's terms of use are enforceable, Verio has never manifested any assent to those terms. Neither defense is availing.

With respect to Verio's first argument, the ICANN Accreditation Agreement specifically disclaims any intention to vest rights in a third-party beneficiary. Section II.S.2 of the Agreement reads: "No Third–Party Beneficiaries. This Agreement shall not be construed to create any obligation by either ICANN or Registrar to any non-party to this agreement, including any SLD holder." (Ex. 27 to Pl.'s Sept. 8, 2000 Motion). Verio argues that while II.S.2 might prevent it from using the Agreement as the basis for a contract cause of action against Register.com, II.S.2 does not foreclose the possibility that the contract grants Verio a defense to this cause of action by creating a privilege or immunity in Verio to access the WHOIS data free from any restrictions which would violate Register.com's promises to ICANN.

However, the authority cited by Verio in support of this argument is unpersuasive. Verio cites 4 Corbin on Contracts § 780 at 67–70, *Rochester Tel. Co. v. Ross,* 195 N.Y. 429, 88 N.E. 793 (1909), *Continental Corp. v. Gowdy,* 283 Mass. 204, 186 N.E. 244 (1933), *Fidelity–Phenix Fire Ins. Co. of New York v. Forest Oil Corp.,* 141 So.2d 841 (La.Ct.App.1962) and *Baurer v. Devenes,* 99 Conn. 203, 121 A. 566 (1923). Most importantly, as Register.com has pointed out, none of the authority cited by Verio addresses a *contract containing a clause similar to II.S.2 of the Agreement specifically disclaiming any intention to benefit a third party.* The Accreditation Agreement, unlike the agreements discussed in the above-cited cases, is clear and unambiguous, and creates no right in Verio to breach its agreement to abide by

Register.com's terms of use for accessing its WHOIS data. Moreover, the cases are distinguishable on other grounds as well.

*Rochester Tel. Co. v. Ross,* 195 N.Y. 429, 88 N.E. 793 (1909) involved a telephone company which, in consideration for being granted a monopolistic franchise to provide telephone service in Rochester, agreed with the city franchisor not to charge subscribers more than $48 per year. Public utilities such as telephone companies occupy a different position than other private companies by virtue of their monopolistic position and by virtue of the necessity of the service they provide. The Restatement (Second) of Torts § 259 (1965) provides that:

> One who has a right to the use of a facility of a public utility is privileged to make any reasonable use of the chattels of the utility that is or is reasonably believed to be necessary to the enjoyment of the facility.

Although Verio does make the argument that it is privileged to access Register.com's WHOIS database, Verio has not specifically argued that the port 43 access facility is a public utility[7] similar to telephone service. Even if Verio were to make that argument, it would fail. Comment (a) to § 259 defines a public utility as:

> [A] person, corporation, or other association carrying on an enterprise for the accommodation of the public, the members of which have the right as such to use its facilities. Instances of a public utility are common carriers, common innkeepers, telegraph and telephone companies, and gas and electric light companies.

New York courts define a public utility as:

> A privately owned and operated business ... which is engaged in regularly supplying the public with some commodity or service which is of public conse-

---

7. In its brief opposing the motion, Verio refers to Register.com's port 43 access channel as a "public resource" and a "public facility." (*See* Def.'s Opp. Memo. at 21 & 22.)

quence [and] need ... The test for determining if a concern is a public utility is whether it has held itself out as ready, able and willing to serve the public. *See City of New York v. New York State Dept. of Health*, 164 Misc.2d 247, 623 N.Y.S.2d 491, 496 (1995) (citing Black's Law Dictionary, 1232 (6th Ed.1990)). The provision of port 43 access to WHOIS data is not "a commodity or service which is of public consequence and need" and therefore Register.com is not acting as a public utility in agreeing to provide port 43 access. *Cf. Island Online, Inc. v. Network Solutions, Inc.*, 119 F.Supp.2d 289, 306–07 (E.D.N.Y.2000) (noting that "the Internet is, by no stretch of the imagination, a traditional and exclusive public function. For most of its history, its growth and development have been nurtured by and realized through private action."); *CompuServe, Inc. v. Cyber Promotions, Inc.*, 962 F.Supp. 1015, 1024 (S.D.Ohio 1997) (holding that under Ohio law, public utility analysis demands that the entity "devote[ ] an essential good or service to the general public" and holding that defendant had not demonstrated that Internet service provider qualified as public utility). Accordingly, Verio has no privilege on that basis to breach its agreement to abide by Register.com's WHOIS terms of use.

In *Continental Corp. v. Gowdy*, 283 Mass. 204, 186 N.E. 244 (1933), the Court permitted the directors of a corporation to interpose a bond contract to which they were not a party as a defense to an action on the bonds. However, the bonds indicated on their face that they were without recourse to the directors, and thereby specifically provided for the defense asserted. *Gowdy* therefore is factually and analytically distinguishable from this case, where no defense was specifically provided to Verio and indeed the Agreement specifically states that it creates duties solely between the parties. *Fidelity–Phenix Fire Ins. Co. of New York v. Forest Oil Corp.*, 141 So.2d 841 (La.Ct.App.1962) is analytically similar to *Gowdy* and therefore provides no support to Verio's position. *See generally id.* (allowing non-party to insurance contract to enforce insurer's explicit waiver of subrogation rights).

Accordingly, the Agreement does not grant Verio a defense to Register.com's breach of contract claim for Verio's violation of the terms of use restrictions Register.com places on access to its WHOIS database.[8]

Reasoning that the terms of the Accreditation Agreement represent quasi-regulatory standards, Verio argues that Register.com's more restrictive terms of use also violate public policy. This argument must fail because ICANN is not a governmental body. No government entity has undertaken to regulate the Internet and no statutory scheme exists to provide the framework for Verio's policy arguments. *See CompuServe*, 962 F.Supp. at 1026. Rather, as discussed above, the Department of Commerce's establishment of ICANN signified a movement away from nascent public regulation of the Internet and toward a consensus-based private ordering regime. Indeed, the Department of Commerce's Statement of Policy on the Management of Internet Names and Addresses, also known as the "White Paper," expressly states:

[T]he Department of Commerce has determined that it should issue a general statement of policy, rather than define or impose a substantive regulatory regime for the domain name system. As such, this policy statement is not a substantive rule, does not contain mandato-

---

**8.** The Court notes that ICANN may terminate Register.com's accreditation under section II. N.4 of the Agreement for its breach of the Agreement. ICANN urges this Court "to promote the integrity of the ICANN process by allowing the contractually specified exclusive remedies for [Register.com's] breach to operate as they were intended." To date this Court is unaware of any decision by ICANN with respect to the issue of Register.com's breach. However, ICANN's inaction does not grant Verio the right to breach its contract with Register.com.

ry provisions, and does not itself have the force and effect of law.

(Ex. B. to McPherson Decl.). Accordingly, the Accreditation Agreement represents a private bargain between ICANN and Register.com and does not provide Verio with any privilege or defense.

Nor can Verio argue that it has not assented to Register.com's terms of use. Register.com's terms of use are clearly posted on its website. The conclusion of the terms paragraph states "[b]y submitting this query, you agree to abide by these terms." (Ex. 27 to Pl.'s Sept. 8, 2000 Motion). Verio does not argue that it was unaware of these terms, only that it was not asked to click on an icon indicating that it accepted the terms. However, in light of this sentence at the end of Register.com's terms of use, there can be no question that by proceeding to submit a WHOIS query, Verio manifested its assent to be bound by Register.com's terms of use, and a contract was formed and subsequently breached.

■ Register.com alleges that the breach has resulted in irreparable harm: in lost opportunities to sell competing services to its opt-in customers, and to its reputation and good will with customers and co-brand partners, who have threatened to take their business elsewhere if Register.com cannot protect the WHOIS contact information.

The classic remedy for breach of contract is an action at law for monetary damages. If the injury complained of can be compensated by an award of monetary damages, then an adequate remedy at law exists and no irreparable injury may be found as a matter of law. However, the Second Circuit has recognized that even where damages are available, irreparable harm may be found where those damages are clearly difficult to assess and measure. The Second Circuit Court's opinion *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir.1999) captures precisely why damages

in this case are incalculable and the harm resulting from the breach is irreparable. The Court wrote, in finding irreparable harm resulting from the breach of a covenant not to compete in an employment contract, "[i]nitially, it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *See id.* at 69.

Neither this Court nor the parties to this action could calculate with any precision the amount of the monetary loss which has resulted and which would result in the future from the loss of Register.com's relationships with customers and co-brand partners. Register.com has therefore demonstrated that Verio's past and future breaches have resulted and will result in irreparable harm. *See also Gulf & Western Corp. v. Craftique Productions, Inc.*, 523 F.Supp. 603, 607 (1981) ("even in situations where damages are available, irreparable harm may be found if damages are 'clearly difficult to assess and measure.'") (citing *Danielson v. Local 275, Laborers Int'l Union of North America*, 479 F.2d 1033, 1037 (2d Cir.1973)).

Register.com has demonstrated both a likelihood of success on the merits of its breach of contract claim with respect to Verio's use of WHOIS data for marketing purposes, and has demonstrated irreparable harm resulting from the breach. Accordingly, it is entitled to an injunction against any future use by Verio of information taken from its WHOIS database for marketing by e-mail, direct mail or telephone.[9]

### B. *Trespass To Chattels*

Register.com argues that Verio's use of an automated software robot to search the "WHOIS" database constitutes trespass to chattels. Register.com states that it has made its computer system available on the Internet, and that "Verio has used 'software automation' to flood that computer

9. Editor's note: The text of this footnote was deleted by the court.

system with traffic in order to retrieve the contact information of Register.com customers for the purpose of solicitation in knowing violation of Register.com's posted policies and terms of use." (Pl.'s Mem. of Law at 36.)

■ The standard for trespass to chattels in New York is based upon the standard set forth in the Restatement of Torts:

> One who uses a chattel with the consent of another is subject to liability in trespass for any harm to the chattel which is caused by or occurs in the course of any use exceeding the consent, even though such use is not a conversion.

*City of Amsterdam v. Goldreyer, Ltd.*, 882 F.Supp. 1273 (E.D.N.Y.1995) (citing Restatement (Second) of Torts, § 256 (1965)).

■ As an initial matter, the Court does not believe that Register.com's terms of use forbid the particular use of the search robot at issue here. Register.com's posted policies and terms of use require a party who seeks access to its WHOIS database to agree that it will not "use this data to ... enable high volume, automated, electronic processes that apply to Register.com (or its systems)." Register.com argues that use of a search robot is prohibited by that term of use. The Court disagrees.

The terms state that under no circumstances may one "use this data [the WHOIS data] to ... *enable* high volume, automated, electronic processes that apply to Register.com." The temporal aspect of this term is important because it only bars future automated processes. Although Verio uses an automated process to *collect* the WHOIS data, it does not then use the collected data to enable an automated process that applies to Register.com's systems. Once Verio's software robot secures the WHOIS information from Register.com's systems, it has completed its automated process with respect to Register.com's systems. The robot does not then use that WHOIS data to "enable high

volume, automated, electronic processes that apply to Register.com (or its systems)," it simply deposits the data into a database.

■ However, despite the fact that Register.com's terms of use may not specifically forbid this use of a search robot by Verio and such use does not therefore constitute a breach of contract, it is clear since at least the date this lawsuit was filed that Register.com does not consent to Verio's use of a search robot, and Verio is on notice that its search robot is unwelcome. (Pl.'s V.C. ¶ 36)

Accordingly, Verio's future use of a search robot to access the database exceeds the scope of Register.com's consent, and Verio is liable for any harm to the chattel (Register.com's computer systems) caused by that unauthorized access. *See CompuServe*, 962 F.Supp. at 1024 (holding that defendants' continued use after CompuServe notified defendants that it no longer consented to the use of its proprietary computer equipment was a trespass) (citing Restatement (Second) of Torts §§ 252 and 892A(5)).

Having established that Verio's access to its WHOIS database by robot is unauthorized, Register.com must next demonstrate that Verio's unauthorized access caused harm to its chattels, namely its computer system. To that end, Robert Gardos, Register.com's Vice President for Technology, submitted a declaration estimating that Verio's searching of Register.com's WHOIS database has resulted in a diminishment of 2.3% of Register.com's system resources. (*See* Gardos Decl. ¶ 32.) However, during discovery, the basis for Gardos' estimations of the impact Verio's search robot had on Register.com's computer systems was thoroughly undercut. Gardos admitted in his deposition that he had taken measurements of neither the capacity of Register.com's computer systems nor the portion of that capacity which was consumed by Verio's search robots. Furthermore, when describing how he ar-

rived at his conclusion that Verio's search robots occupied a certain percentage of Register.com's systems capacity, Mr. Gardos testified that the numbers he used were "all rough estimates." (Gardos Depo. at 76).

Although Register.com's evidence of any burden or harm to its computer system caused by the successive queries performed by search robots is imprecise, evidence of mere possessory interference is sufficient to demonstrate the quantum of harm necessary to establish a claim for trespass to chattels. "A trespasser is liable when the trespass diminishes the condition, quality, or value of personal property." *EBay, Inc. v. Bidder's Edge, Inc.,* 100 F.Supp.2d 1058, 1071 (N.D.Cal.2000) (citing *CompuServe,* 962 F.Supp. at 1022). "The quality or value of personal property may be 'diminished even though it is not physically damaged by defendant's conduct.'" *Id.* Though it does correctly dispute the trustworthiness and accuracy of Mr. Gardos' calculations, Verio does not dispute that its search robot occupies some of Register.com's systems capacity.

Although Register.com was unable to directly measure the amount by which its systems capacity was reduced, the record evidence is sufficient to establish the possessory interference necessary to establish a trespass to chattels claim. As the *eBay* Court wrote:

> BE argues that its searches present a negligible load on plaintiff's computer systems, and do not rise to the level of impairment to the condition or value of eBay's computer system required to constitute a trespass. *However, it is undisputed that eBay's server and its capacity are personal property, and that BE's searches use a portion of this property. Even if, as BE argues, its searches only use a small amount of eBay's computer system capacity, BE has nonetheless deprived eBay of the ability to use that portion of its personal property for its own purposes. The law recognizes no such right to use an-*

*other's personal property. Accordingly,* BE's actions appear to have caused injury to eBay and appear likely to continue to cause injury to eBay.

(100 F.Supp.2d at 1071.) (emphasis added).

Furthermore, Gardos also noted in his declaration "if the strain on Register.com's resources generated by Verio's searches becomes large enough, it could cause Register.com's computer systems to malfunction or crash" and "I believe that if Verio's searching of Register.com's WHOIS database were determined to be lawful, then every purveryor of Internet-based services would engage in similar conduct." (Gardos Decl. ¶¶ 33, 34). Gardos' concerns are supported by Verio's testimony that it sees no need to place a limit on the number of other companies that should be allowed to harvest data from Register.com's computers. (*See* Ayers Depo. at 71). Furthermore, Verio's own internal documents reveal that Verio was aware that its robotic queries could slow the response times of the registrars' databases and even overload them. (*See* Ex. 29 & to Pl.'s Sept. 8, 2000 Motion). Because of that possibility, Verio contemplated cloaking the origin of its queries by using a process called IP aliasing. (*See id.; see also* Ex. 64 to Pl.'s Sept. 8, 2000 Motion).

Accordingly, Register.com's evidence that Verio's search robots have presented and will continue to present an unwelcome interference with, and a risk of interruption to, its computer system and servers is sufficient to demonstrate a likelihood of success on the merits of its trespass to chattels claim.

■ There is no adequate remedy at law for an ongoing trespass and without an injunction the victim of such a trespass will be irreparably harmed. The *eBay* court specifically held that eBay was entitled to preliminary injunctive relief based on the claim that if such relief were denied, other companies would be encouraged to deploy search robots against eBay's servers and would further diminish eBay's server ca-

pacity to the point of denying effective access to eBay's customers. *See id.* at 1071–72.

The same reasoning applies here. Register.com, through Mr. Gardos, has expressed the fear that its servers will be flooded by search robots deployed by competitors in the absence of injunctive relief. Register.com has therefore demonstrated both a likelihood of success on the merits of its trespass to chattels claim and the existence of irreparable harm, and is entitled to a preliminary injunction against Verio based upon that claim.

### C. Computer Fraud And Abuse Act §§ 1030(a)(2)(C) and (a)(5)(C)

The issue of the scope of Verio's authorization to access the WHOIS database is also central to the Court's analysis of Register.com's claims that Verio is violating two discrete provisions of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.*[10]

Register.com claims both that the use of software robots to harvest customer information from its WHOIS database in violation of its terms of use violates 18 U.S.C. §§ 1030(a)(2)(C) and (a)(5)(C), and that using the harvested information in violation of Register.com's policy forbidding the use of WHOIS data for marketing also violates those sections. That is, that both Verio's method of accessing the WHOIS data and Verio's end uses of the data violate the CFAA.

### 1. Verio's Use of Search Robots

Both §§ 1030(a)(2)(C) and (a)(5)(C) require that the plaintiff prove that the defendant's access to its computer system was unauthorized, or in the case of § 1030(a)(2)(C) that it was unauthorized or

exceeded authorized access. However, although each section requires proof of some degree of unauthorized access, each addresses a different type of harm. Section 1030(a)(2)(C) requires Register.com to prove that Verio intentionally accessed its computers without authorization *and thereby obtained information.* Section 1030(a)(5)(C) requires Register.com to show that Verio intentionally accessed its computer without authorization *and thereby caused damage.*

As discussed more fully in the context of the trespass to chattels claim, because Register.com objects to Verio's use of search robots they represent an unauthorized access to the WHOIS database.

The type of harm that Register.com alleges is caused by the search robots, including diminished server capacity and potential system shutdowns, is better analyzed under § 1030(a)(5)(C), which specifically addresses damages to the computer system. Pursuant to the pertinent part[11] of § 1030(e)(8), "the term 'damage' means any impairment to the integrity or availability of data, a program, a system, or information that (A) causes loss aggregating at least $5000 in value during any 1-year period to one or more individuals."

On this record Register.com has demonstrated that Verio's unauthorized use of search robots to harvest registrant contact information from Register.com' WHOIS database has diminished server capacity, however slightly, and could diminish response time, which could impair the availability of data to clients trying to get registrant contact information. Moreover, Register.com has raised the possibility that if Verio's robotic queries of Register.com's WHOIS database were deter-

10. Remedies under this criminal code provision include injunctive relief under 18 U.S.C. § 1030(g).

11. None of the other provisions of § 1030(e)(8) are relevant to this case. Section 1030(e)(8)(B) covers impairment or modification of data or systems affecting "the medical examination, diagnosis, treatment, or care of one or more individuals;" § 1030(e)(8)(C) covers impairment or modification of data or systems causing "physical injury to any person," and 1030(e)(8)(D) covers impairment or modification of data or systems which "threatens public health or safety."

mined to be lawful, then other vendors of Internet services would engage in similar conduct. This Court finds that it is highly probable that other Internet service vendors would also use robots to obtain this potential customer information were it to be permitted. The use of the robot allows a marketer to reach a potential client within the first several days of the domain name registration, an optimal time to solicit the customer for other services. In contrast, if instead of using a search robot the service vendor obtains registrant contact information pursuant to a bulk license, the vendor must wait to receive the information on a weekly basis. As Eric Eden, the director of operation Henhouse wrote in an e-mail to a Verio employee "[c]onsistent testing has found that the faster we approach someone after they register a domain name, the more likely we are to sell them hosting." (Ex. 40 to Pl.'s Sept. 8, 2000 Motion).

If the strain on Register.com's resources generated by robotic searches becomes large enough, it could cause Register.com's computer systems to malfunction or crash. Such a crash would satisfy § 1030(a)(5)(C)'s threshold requirement that a plaintiff demonstrate $5000 in economic damages [12] resulting from the violation, both because of costs relating to repair and lost data and also because of lost good will based on adverse customer reactions.

A potential harm which cannot be addressed by a legal or equitable remedy following a trial, such as the loss of customers that might result from a system shutdown or slowed response times complained of here, constitutes an irreparable

injury. *See Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 799–800 (3rd Cir.1989); *Cyber Promotions, Inc. v. Apex Global Info. Services*, 1997 WL 634384, at *2 (E.D.Pa.1997). A showing that a plaintiff may suffer a substantial loss of business if relief is not granted meets the standards for interim relief. *See Doran v. Salem Inn*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975).

Because Register.com has demonstrated that Verio's access to its WHOIS database by means of an automated search robot is unauthorized and caused or could cause $5000 in damages by impairing the availability of data or the availability of its computer systems, Register.com has established both irreparable harm and a likelihood of success on the merits of its claim that Verio's use of the search robot violated § 1030(a)(5)(C) of the Computer Fraud And Abuse Act. Register.com is therefore entitled to injunctive relief based upon this claim.

### 2. Verio's Use of WHOIS Data For Marketing Purposes

■ With respect to its use of Register.com's WHOIS data for e-mail, direct mail and telephone marketing, Verio argues that such an act can only be analyzed under § 1030(a)(2)(C)'s provision assessing liability where a party exceeds authorized access and obtains information it is not entitled to obtain. Verio argues that because it is authorized to access the WHOIS database for some purposes its access was authorized. Verio then argues that its conduct must meet the Act's specific definition of conduct that "exceeds authorized

---

12. Register.com relies upon lost revenue from Verio's exploitation of the WHOIS data for marketing purposes to constitute the damages required under § 1030(a)(5)(C). Although lost good will or business could provide the loss figure required under § 1030(a)(5)(C), it could only do so if it resulted from the impairment or unavailability of data or systems. The good will losses cited by Register.com are not the result of the harm addressed by § 1030(a)(5)(C). How Verio uses the WHOIS

data, once extracted, has no bearing on whether Verio has impaired the availability or integrity of Register.com's data or computer systems in extracting it. Accordingly, because violating an anti-marketing restriction on the end use of data harms neither the data nor the computer and therefore does not cause the type of harm that § 1030(a)(5)(C) addresses, the specific good will damages cited by Register.com cannot satisfy its burden under § 1030(a)(5)(C).

access." Pursuant to the definition contained in § 1030(e)(6) of the CFAA, "the term 'exceeds authorized access' means to access a computer with authorization and to use such access to obtain or alter information in the computer *that the accessor is not entitled to obtain* or alter." 18 U.S.C. § 1030(e)(6) (emphasis added). Verio then argues that this definition does not contemplate a violation of end use restrictions placed on data as "exceeding authorized access," and therefore that Verio has not violated § 1030(a)(2)(C).

Again, neither party disputes that Verio is not authorized under Register.com's terms of use to use the data for mass marketing purposes, and neither party disputes that Verio is authorized to obtain the data for some purposes. However, Verio's distinctions between authorized access and an unauthorized end use of information strike the Court as too fine. First, the means of access Verio employs, namely the automated search robot, is unauthorized. Second, even if Verio's means of access to the WHOIS database would otherwise be authorized, that access would be rendered unauthorized *ab initio* by virtue of the fact that prior to entry Verio knows that the data obtained will be later used for an unauthorized purpose.

█ Accordingly, the Court finds that Verio's access to the WHOIS database was unauthorized and that Verio violated § 1030(a)(2)(C) by using that unauthorized access to obtain data for mass marketing purposes. As discussed above, the harvesting and subsequent use of that data has caused and will cause Register.com irreparable harm. Therefore, because Register.com has demonstrated a likelihood of success on the merits of its claim that Verio's use of its WHOIS data for mass marketing purposes violates § 1030(a)(2)(C) of the Computer Fraud And Abuse Act and has demonstrated irreparable harm stemming from that violation, Register.com is entitled to injunctive relief based on that claim.

### D. *Lanham Act*

█ Section 43(a) of the Lanham Act prohibits any false designation of origin which

> is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities with another person.

15 U.S.C. § 1125(a)(1). In order to prove its Lanham act claims, Register.com must demonstrate that it has a valid mark entitled to protection and that Verio's conduct is likely to cause confusion concerning the source or sponsorship of Verio's services. *See, e.g., Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 137 (2d Cir.1999).

Verio does not dispute that Register.com has a valid and protectible mark. It does however dispute Register.com's claims that its customers were or will continue to be confused about Verio's relationship to Register.com because of Verio's marketing practices. Verio also argues that if confusion occurred or is likely to occur in the future, it is not the type of confusion actionable under the Lanham Act.

To begin with, Verio's solicitation of Register.com's customers evolved over the course of project Henhouse. Initially, some of Verio's e-mail solicitations mentioned Register.com's name and contained the phrase "first step," which is similar to "first step on the web," a phrase for which Register.com has sought trademark protection. (*See, e.g.,* Ex. 14 to Pl.'s Sept. 8, 2000 Motion). These e-mails, because they use Register.com's marks, were clearly likely to cause confusion as to whether there was some affiliation or sponsorship between Verio and Register.com, and therefore violated the Lanham Act. And, by a letter dated May 9, 2000, Verio agreed not to refer to the Register.com mark or any other similar mark in its future solicitations.

■ Register.com maintains that even without these references, Verio's subsequent solicitations violated the Lanham Act. While Verio's later phone solicitations did not mention the Register.com or "first step" marks, they did indicate that the caller from Verio was calling "regarding your recently registered domain name" or "regarding the registration of [domain name]. Please contact me at your earliest convenience . . . If I don't hear from you in a couple days, I will call back." (See Exs. 44 & 45 to Pl.'s Sept. 8, 2000 Motion). Whether these solicitations violate the Lanham Act is a closer question. Although Verio does not employ any of Register .com's marks in these communications, the Court finds that the phrasing does create the impression that the reason for the call is related to the registration of the domain name, rather than the solicitation of web hosting services for the new domain name. The Court also finds that the impression that Verio telemarketers are calling because of some problem with the domain name registration could lead to confusion with respect to whether there is some affiliation or sponsorship between Verio and Register.com. In fact, Register.com presented evidence of actual customer confusion stemming from this practice. (See Pl.'s Ex. 12 "The telephone message seemed to me to imply that there was some problem with the name I had just registered"). Accordingly, such phrasing violates the Lanham Act.

■ Register.com also seems to claim that Verio's solicitations violate the Lanham Act regardless of their content because of the short time between the customers' registration of a domain name with Register.com and the solicitation by Verio. Register.com alleges that because of the timing its customers are under the mistaken impression that Verio is affiliated with Register.com and because of that give greater consideration to these solicitations than they otherwise would.

However, to make out a claim under § 43(a) sufficient to entitle it to injunctive relief, Register.com must show that (1) Verio makes material misrepresentations about the nature, characteristics or geographic origin of its services; (2) it uses the false or misleading representations "in commerce" (3) it makes the representations in the context of commercial advertising or commercial promotion; and (4) that Register.com is likely to be damaged by the misrepresentations. *See Towers Financial Corp. v. Dun & Bradstreet, Inc.,* 803 F.Supp. 820, 823 (S.D.N.Y.1992) (citing *McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.,* 938 F.2d 1544, 1548–49 (2d Cir.1991)); *National Artists Management Co. v. Weaving,* 769 F.Supp. 1224, 1230 (S.D.N.Y.1991); McCarthy on Trademarks, § 27.04(1)(a).

Register.com cannot claim that rapid timing alone constitutes a violation of the Lanham Act where Verio neither makes a false or misleading representation about the origin of its services nor uses Register.com's mark in its solicitations. *See Holiday Inns, Inc. v. 800 Reservation, Inc.,* 86 F.3d 619, 625 (6th Cir.1996) ("the defendants' use of a protected mark or their use of a misleading representation is a prerequisite to the finding of a Lanham Act violation."). It is not enough that Register.com's customers might be confused as to any affiliation between Register.com and Verio because of Verio's rapid solicitation. To state a claim under § 43(a), Register.com must show not only that its customers are confused, but that they have been misled by some representation made by Verio.

Register.com is correct that some of Verio's solicitations were in the past misleading on their face and violated the Lanham Act. Register.com is also correct that some of Verio's more recent solicitations, although they did not use any protected mark, created confusion as to whether Verio was calling because of some problem with the customer's domain name registration, which resulted in confusion with respect to whether Verio and Register.com were affiliated in any way. Accordingly,

the Court finds on the current record that Register.com is likely to succeed on the merits of its claims of unfair competition and false designation of origin under § 43(a) of the Lanham Act with respect to any e-mail, telephone, or direct mail solicitation that uses the "Register.com" or "first step on the Web" marks or any similar marks. Register.com is also likely to succeed on Lanham Act claims claims based on Verio's solicitations that suggest that Verio is calling with regard to the registration of the domain name or any problem arising from that registration. As more fully discussed in the context of the breach of contract claim, these Lanham Act violations may result in the irreparable harm of lost client relationships.

Accordingly, the Court enjoins Verio from any future use in its e-mail, direct mail, or telephone solicitations of the marks Register.com or "first step on the web" or any similar mark. Furthermore, the Court enjoins Verio from indicating in any affirmative way that it is calling regarding the registration of the customer's domain name, rather than in regard to the provision of web-hosting or other services related to the domain name.

### V. Injunction

For the foregoing reasons and pursuant to Fed.R.Civ.P. 65, it is hereby ORDERED, that pending a final decision on the merits of plaintiff's claims, defendant Verio Inc., its officers, agents, servants, employees, successors and assigns, all persons acting in concert or participation with Verio, and/or acting on its behalf or at its direction (collectively, "Verio"), are enjoined from engaging in the following activities:

1. Using or causing to be used the "Register.com" mark or the "first step on the web" mark or any other designation similar thereto, on or in connection with the advertising, marketing, or promotion of Verio and/or any of Verio's services;

2. Representing, or committing any act which is calculated to or is likely to cause third parties to believe that Verio and/or Verio's services are sponsored by, or have the endorsement or approval of Register.com;

3. Accessing Register.com's computers and computer networks in any manner, including, but not limited to, by software programs performing multiple, automated, successive queries, provided that nothing in this Order shall prohibit Verio from accessing Register.com's WHOIS database in accordance with the terms and conditions thereof; and

4. Using any data currently in Verio's possession, custody or control, that using its best efforts, Verio can identify as having been obtained from Register.com's computers and computer networks to enable the transmission of unsolicited commercial electronic mail, telephone calls, or direct mail to the individuals listed in said data, provided that nothing in this Order shall prohibit Verio from (i) communicating with any of its existing customers, (ii) responding to communications received from any Register.com customer initially contacted before August 4, 2000, or (iii) communicating with any Register.com customer whose contact information is obtained by Verio from any source other than Register.com's computers and computer networks.

### VI. Bond

Pursuant to Fed.R.Civ.P. 65(c), plaintiff is ordered to provide security in the amount of $250,000.

SO ORDERED.