**TOTALPLAN CORPORATION OF AMERICA, Plaintiff–Appellant,**

v.

**Robert B. COLBORNE; Carmen Strong; James Boughton; John T. Brown; Keith Yardley; Wendell A. Lewis; Harry S. Montgomery; Walter Petrovsky; Richard L. Mikesell, Northwest Pipe & Supply Company, Limited; Michael Chwelos; William Meiklejohn; Lure Camera, Limited, Defendants–Appellees.**

No. 505, Dockets 93–7472, 93–7474, 93–7476 and 93–7478.

United States Court of Appeals, Second Circuit.

Argued Oct. 27, 1993.

Decided Feb. 2, 1994.

Lisa T. Sofferin, Buffalo, New York (Rodney O. Personius, Brown & Kelly, Buffalo, New York, of counsel), for plaintiff-appellant.

Richard L. Mikesell, Buffalo, New York (Craig Miller, Diebold & Farmello, P.C., Buffalo, New York, of counsel), for defendants-appellees.

Before: VAN GRAAFEILAND, PIERCE and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Totalplan Corporation of America ("Totalplan") appeals from Judge Elfvin's dismissal of its complaint following a bench trial. In the district court, Totalplan brought suit against appellees for trademark infringement, breach of contract, unfair competition, misappropriation of trade secrets, conspiracy to steal business, and fraudulent transfer of assets. Totalplan appeals from only the dismissal of its trademark and contract claims, directing its arguments solely against Lure Camera, Ltd. ("Lure"), Northwest Pipe & Supply Co., Ltd. ("Northwest"), Michael Chwelos, as President of Northwest, and William Meiklejohn, as a director of Lure. We remand for clarification with regard to the domestic trademark infringement claim and affirm the dismissal of the complaint with respect to the breach of contract claim.

## BACKGROUND

Totalplan is a New York corporation, incorporated in 1974. Lure is a Canadian company that commenced doing business in California in 1974. Lure owned a United States patent on a disposable pocket camera that was marketed under the name "Lure." In 1975, Paul Iannello, the President of Totalplan, became interested in marketing the Lure pocket camera. After meeting with Sidney Dunofsky, then President of Lure, the parties reached an agreement and, on May 27, 1975, signed a contract to provide Totalplan with distribution rights ("the 1975 agreement"). Under the terms of the agreement, Lure agreed to supply Totalplan with 12–shot disposable cameras that would bear a brand name of Totalplan's choice on the front and a backplate bearing the name "Totalplan." Totalplan was given exclusive television and radio marketing rights in the United States and non-exclusive marketing rights through other media.

Totalplan selected the trademark "Love Pocket Cameras" for the product and obtained United States registration of this trademark. After paying for packaging and the tools and dye necessary to manufacture the new frontplates and backplates of the cameras, Totalplan produced television commercials to promote the camera. By October 1975, Totalplan had purchased 15,000 cameras from Lure. However, Totalplan became dissatisfied with the quality of the cameras, and, in November 1975, brought the problems to the attention of Dunofsky and Harry Montgomery, Lure's Vice–President. After receiving assurances that quality problems would be solved, Totalplan continued to market the cameras, but in reduced numbers.

In November 1977, Lure sold its assets to Northwest and leased them back. Northwest's President, Michael Chwelos, then replaced Dunofsky as President of Lure. In 1978, Iannello agreed to meet with Chwelos and other Lure officials about expanding the marketing of the pocket camera. Wendell A. Lewis, President of Total Marketing Concepts, Inc., who had previously marketed the pocket camera under the name "Lure," attended the first meeting. At a later meeting in Chicago, it was proposed that Lure cease marketing the "Lure" camera, and produce cameras only under the name "Love." A marketing plan was also proposed whereby all cameras would be manufactured with Love frontplates and backplates bearing Totalplan's name and address. It was proposed that, in exchange for exclusive sales and marketing rights, Totalplan purchase a minimum number of cameras per month for twelve months under a purchase order backed by a domestic letter of credit. Under the proposed scheme, Totalplan would handle marketing on the East Coast, and Lewis would manage West Coast marketing through "Totalplan–West," a division of Totalplan. It was anticipated that Totalplan would prepare all packaging and labels. The packaging was to list two addresses, in Van Nuys, California, and Rochester, New York, where the

cameras could be returned for film processing. At the Chicago meeting, Lure also proposed that it credit Totalplan with a sale of 100,000 cameras that Montgomery and Lewis had negotiated with Japan. This credit was to aid Totalplan in meeting projected sales and to compensate it for the expense of processing Lure cameras that remained in the market when they were returned.

After the Chicago meeting, numerous drafts of the proposed agreement were circulated. However, none was ever signed. Each draft required that Totalplan purchase a minimum number of cameras, backed by a letter of credit. Totalplan never supplied the letter of credit. One draft, prepared by Totalplan, proposed that Lewis would manage Totalplan–West and be compensated by Totalplan by receiving a commission for the sale of Love cameras. Lewis, through Northwest's attorney, Richard Mikesell, changed the name "Lewis" on the draft to "Pro–West Industries."

In April 1987, Iannello opened two bank accounts for Totalplan–West, one accessible only to him and one accessible to him and to Lewis, in the latter's capacity as manager of Totalplan–West. It was proposed that Totalplan would pay for all cameras purchased from Lure for distribution through Totalplan–West, and Totalplan–West would deposit into the accounts all money received from customers who returned cameras to California for processing. The sums placed in the account exclusively accessible to Iannello were to be sufficient to cover the costs of purchasing the cameras. Lewis, acting through Pro–West, then moved Totalplan–West into the building where Lure's California manufacturing plant was located.

Totalplan began production of labels with the California and New York addresses, as suggested in the proposed agreement. In addition, on April 10, 1978, Totalplan caused 2,880 cameras to be purchased from Lure for Totalplan–West, which were then sold through Totalplan–West to Japan. On April 18, 1978, Totalplan purchased 7,120 cameras for sale to Hikawa Shoji Company in Japan. On May 25, 1978, it purchased another 15,000 cameras for Totalplan–West, which were then shipped to Japan.

In May 1978, Iannello complained to Chwelos and Montgomery that Lewis was not depositing customer money into the Totalplan–West accounts while Totalplan was paying for the cameras that Lure shipped to Totalplan–West. Totalplan then paid $20,000 to Lure for cameras to be shipped through Totalplan–West to Japan. At the end of May, Total Marketing Concepts delivered a check for $40,000 to Totalplan as payment for cameras purchased by Totalplan and shipped to Japan by Totalplan–West. Although the district judge found that this exchange of payments was for cameras that bore the trademark "Love" on the frontplate, the evidence indicates that it related to shipments of "Lure" cameras. Indeed, there is no evidence that any cameras paid for by Totalplan and ultimately shipped to Japan bore the trademark "Love" on their frontplate.

On June 6, 1978, Mikesell sent a letter to John Papsidero, a director of Totalplan, that "put Totalplan Corporation on notice that there exists no continuing commitment on the part of Lure to supply Totalplan Corporation with 'Love' cameras for any fixed price, nor indeed to supply them at all." Papsidero responded by letter that the Chicago meeting had "culminated in an agreement between Totalplan and Lure, an agreement which both parties are performing."

Soon after the exchange of these letters, Totalplan began receiving shipments of cameras from Totalplan–West and Lure that contained backplates with Lure's address and packaging bearing only the California processing address. Iannello then went to California to examine Totalplan–West's books, but he asserts that he was denied access to them. On August 9, 1978, Mikesell again wrote to Papsidero, informing him that at an August 1 meeting, Lure had expressed displeasure to Iannello for Totalplan's failure to post a letter of credit and that if the letter was not posted in sixty days, Lure would cease "gratuitously" extending "world marketing rights" to Totalplan.

On October 12, 1978, Iannello sent a telegram to Chwelos, directing him "to cease any and all further connections with Totalplan–West and the Love Camera[ ] [California]

office." It further ordered Chwelos to cease all manufacture and sale of Love cameras and to cease placing "Lure" backplates on cameras bearing the "Love" frontplate.

In late 1978, Totalplan began receiving complaints from customers and responded by sending form letters. At trial, Iannello estimated that Totalplan sent out a "few hundred" of these letters. There is no record of the content of the customer complaints, but judging from the response in the form letters, the customers appeared to be having difficulty receiving prints or new cameras from the Van Nuys processing center. One response letter suggested that some customers may have purchased "Lure" cameras rather than "Love" cameras.

On October 22, 1978, Lure and Pro–West entered into an agreement giving Pro–West the exclusive right to market the pocket camera. In November 1978, Lure filed suit against Totalplan in the Superior Court of California, alleging *inter alia* that Totalplan had failed to pay Lure for cameras shipped to it. Totalplan filed a cross-complaint alleging, *inter alia,* breach of the 1975 agreement. In 1983, after a one-day bench trial, the California Superior Court awarded Lure $27,656.28 on its claim and awarded Totalplan $111,171.33 on its counterclaims.

Totalplan stopped marketing the Love Camera in 1979 and allowed its trademark to expire. Lure continued to sell Love cameras to Pro–West through September 12, 1979. The invoices for these cameras indicate that the cameras were generally destined for Japan, with one invoice reflecting a sale to Argentina. One invoice dated after Totalplan's October 12, 1978, telegram reflects a sale of Love cameras by Lure to a United States customer other than Pro–West. On February 13, 1979, 100 Love Pocket Cameras were shipped by Lure to Pivec Associates, Inc. in Baltimore, Maryland. The invoice indicates that Lure received $450 for the cameras.

The instant action was commenced on August 16, 1982, when Totalplan filed complaints against defendants, alleging trademark infringement, breach of contract, unfair competition, misappropriation of trade secrets, conspiracy to steal business, and fraud-

ulent transfer of assets. On October 2, 1990, Judge Elfvin granted defendants' motion *in limine* to exclude from the trial evidence pertaining to issues that were or should have been litigated in the California state court action. The court concluded that it would be "inappropriate" to relitigate "certain issues of liability and damages arising out of the 1975 contract." After a seven-day bench trial, Judge Elfvin dismissed the complaint. On appeal, Totalplan argues that Judge Elfvin erred in dismissing the trademark and breach of contract claims against Lure, Northwest, Chwelos, and Meiklejohn.

## DISCUSSION

### 1. *The Proper Parties to this Appeal*

■ Appellees argue that Chwelos and Meiklejohn are not proper parties to this appeal. They assert that Totalplan should be bound by a stipulation signed by the parties that the appeal would be withdrawn with respect to, *inter alia,* Chwelos and Meiklejohn. However, Totalplan appears to have had second thoughts, and the stipulation was never filed with the clerk. In *Sampson v. Sony Corporation,* 434 F.2d 312 (2d Cir.1970), we enforced a signed stipulation that parties would be bound as to issues raised and decided in a motion for summary judgment, despite a failure to file the stipulation. In reaching our conclusion, however, we stated that the appellant was unable to "direct[ ] us to any other rule which would require that a stipulation be filed with the court in order to be effective to bind the persons entering into it." *Id.* at 315. In contrast, in the instant case, the parties stipulated to a withdrawal "pursuant to Rule 42(b) of the Federal Rules of Appellate Procedure." Rule 42(b) provides that an appeal shall be dismissed "[i]f the parties to an appeal ... sign *and file* with the clerk of the court of appeals an agreement that the proceeding be dismissed." Fed.R.App.P. 42(b) (emphasis added). Because there is a specific rule of federal procedure requiring filing in order to obtain a stipulated dismissal, Totalplan was free to withdraw from the agreement, and Chwelos and Meiklejohn have not been dismissed. *See also Boks v. Charles E.*

*Smith Management, Inc.*, 453 A.2d 113 (D.C.App.1982) (unfiled stipulated dismissal not binding on court where stipulation had not previously been brought before court in any way).

Appellees also assert that Northwest is not a proper party to the appeal. Their argument is essentially that there is no basis upon which to pierce the corporate veil. Because the district judge dismissed the complaints, he did not address this issue after trial, and we thus also decline to reach it. Northwest's liability may be addressed on remand if the district judge concludes that Lure is liable to Totalplan.

### 2. *Trademark Infringement*

Totalplan argues that the district judge erred in failing to find that it had established infringement of its registered "Love" camera trademark. It contends that the appellees infringed its mark by distributing Love cameras in the United States and foreign countries, primarily Japan.

#### A. *Domestic Infringement*

Section 1114(1)(a) of Title 15 U.S.C. provides that a person who uses a registered trademark in commerce without consent of the registrant shall be liable for infringement where "such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a) (1988). "For a finding of infringement a probability of confusion, not a mere possibility, must be found to exist." *Guner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1077 (2d Cir.1993).

■ Totalplan asserts that $45,831.60 worth of infringing Love cameras were sold to parties in the United States. Totalplan introduced Lure invoices reflecting sales of Love cameras to parties in the United States. However, all but one of those invoices concerned sales to Northwest or Pro–West, the marketing company controlled and run by Wendell Lewis. The sale of Love cameras by Lure to Pro–West or Northwest could not have caused confusion, because these parties were fully aware of the fractured relationship between Lure and Totalplan, and neither Lewis's nor Northwest's representatives would have mistakenly concluded that the cameras were supplied by Totalplan. Furthermore, as counsel for Totalplan conceded at oral argument, there is no evidence that Pro–West or Northwest resold any infringing Love cameras in the United States.[1] Judge Elfvin's failure to find domestic infringement with respect to these sales was therefore not erroneous.

Invoice number 3149, dated February 13, 1979, however, does reflect a sale of 100 Love cameras to Pivec Associates, Inc. in Baltimore, Maryland. Judge Elfvin's decision fails to address this $450 sale. It is impossible to determine the basis for his concluding that the invoice was not evidence of infringement. We therefore remand to the district court to clarify its finding of non-infringement with respect to this invoice.

With regard to domestic infringement by Lure beyond this $450 sale, Totalplan relies solely upon the form letters issued by Totalplan in response to customer complaints as evidence of such infringement. These letters are insufficient to prove that Lure marketed the Love camera in the United States, beyond the $450 sale to Pivec and sales to Pro–West. Although Iannello estimated that Totalplan sent out a few hundred of these letters, there is no other record of the customer complaints. More critically, the letters do not establish that the complaining customers had purchased cameras that were marked "Love" and had been distributed by Lure rather than Totalplan.

#### B. *Foreign Distribution*

Totalplan also argues that the district judge erred in concluding that appellees' distribution of Love cameras to Japan via Pro–West was beyond the reach of the Lanham Act. It asserts that Lure's affixing of Love faceplates to cameras in the United States

---

[1]. Invoice number 3144 reflects a sale of cameras by Lure to Pro–West for shipment to "Lou Hochman, Unique Specialties." Because this invoice does not indicate that the goods bore the trademark "Love," as opposed to Lure, this invoice does not establish domestic distribution of Love cameras by Pro–West.

for eventual sale in Japan by Pro–West constituted actionable infringement of its mark.

The extraterritorial reach of the Lanham Act was first addressed by the Supreme Court in *Steele v. Bulova Watch Co.,* 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 319 (1952). In *Bulova,* the Court held that a district court had jurisdiction under the Lanham Act to enjoin a United States citizen from manufacturing in Mexico watches that were stamped "Bulova." Plaintiff had registered the "Bulova" mark in the United States but not in Mexico. In so concluding, the Court emphasized that the defendant's Mexican "Bulovas" had been filtering into Texas and that the plaintiff had received numerous complaints from domestic watch-repairmen who had discovered that the watches were not genuine. *Id.* at 285, 73 S.Ct. at 255. Because of the resultant confusion and harm to plaintiff's goodwill within the United States, the Court concluded that the Lanham Act reached defendant's Mexican activities. *Id.* at 286–87, 73 S.Ct. at 255–56.

■ In *Vanity Fair Mills v. T. Eaton Co.,* 234 F.2d 633 (2d Cir.), *cert. denied,* 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956), we concluded that under *Bulova,* three factors were relevant to a determination of the extraterritorial reach of the Lanham Act: (1) whether the defendant was a United States citizen, (2) whether the defendant's conduct had a substantial effect on United States commerce, and (3) whether there was a conflict with trademark rights established under foreign law. *Id.* at 642–43. In *Vanity Fair,* the defendant was not a United States citizen and there was a conflict with trademark rights established under foreign law. Stating that either one of these factors "might well be determinative and . . . the [presence] of both is certainly fatal," we then held that "the remedies provided by the Lanham Act . . . should not be given extraterritorial application against foreign citizens acting under presumably valid trademarks in a foreign country." *Id.* at 643.

■ The district judge properly concluded that the Lanham Act does not reach appellees' Japanese distribution of Love cameras. First, none of the appellees is a United States citizen. Thus, unlike *Bulova,* this case does not implicate the United States' "broad power to regulate the conduct of its citizens in foreign countries." *Vanity Fair,* 234 F.2d at 642. Although appellees' Canadian citizenship alone may not be sufficient to defeat Totalplan's claim of Japanese infringement, it is a factor weighing against extraterritorial application of the Lanham Act. *Cf. Calvin Klein Industries v. BFK Hong Kong, Ltd.,* 714 F.Supp. 78, 80 (S.D.N.Y.1989) (finding jurisdiction under Lanham Act where defendant not a United Sates citizen but resided in the United States and controlled co-defendant New York corporation); *A.T. Cross Co. v. Sunil Trading Corp.,* 467 F.Supp. 47, 50 n. 5 (S.D.N.Y.1979) (same).

Second, the district judge did not err in finding that Totalplan failed to demonstrate that Lure's shipment of Love cameras abroad had a substantial effect on United States commerce. Unlike *Bulova,* there is no evidence that infringing goods have affected United States commerce by re-entering the country and causing confusion. Furthermore, although Totalplan relies on the Fifth Circuit's decision in *American Rice, Inc. v. Arkansas Rice Growers,* 701 F.2d 408 (5th Cir.1983), for the proposition that the packaging and shipment of goods from the United States constitutes a "substantial effect" on United States commerce, *American Rice* merely established that such activities, when combined with diversion of foreign sales from a plaintiff, constitute "more than an insignificant effect on United States commerce." *Id.* at 414–15. *American Rice* is in conflict with *Vanity Fair,* because it specifically rejected the "substantial effect" requirement in favor of a more lenient "some effect" standard. *Id.* at 414 n. 8.

Totalplan has not shown that any foreign sales of Love cameras have been diverted from it by Lure's shipment to Japan. Although the district judge stated that Totalplan purchased Love cameras for Totalplan–West that were then shipped to Japan, Totalplan's President Iannello testified that the cameras shipped to Japan bore the Lure frontplate. Totalplan's invoice sheet indicates that it paid for additional cameras for shipment to Japan through Totalplan–West, but the invoice sheet does not establish that

these were Love cameras. In addition, according to testimony of Totalplan's President Iannello, any contact that Totalplan had with a Japanese company regarding foreign distribution related to the marketing of Lure cameras, not Love cameras. Finally, on cross-examination, Iannello testified that Totalplan never directly sold any cameras overseas. In light of this ambiguous evidence, the district judge did not clearly err in failing to find that sales of Love cameras were lost because Totalplan and Lure were in competition in Japan.[2]

Two of the three conditions necessary to bring appellees' conduct within the Lanham Act, United States citizenship and a substantial effect on United states commerce, have thus not been established by Totalplan. As was the case in *Vanity Fair,* the absence of two of the three *Bulova* factors in this case is fatal to an argument that the conduct is governed by the Lanham Act. *Cf. Sterling Drug, Inc. v. Bayer AG,* 14 F.3d 733 (2d Cir.1994) (declining to apply mechanically *Vanity Fair* to preclude extraterritorial application of Lanham Act to extent that foreign use of a trademark has "significant trade-mark impairing effects on United States commerce"). Therefore, we need not reach the third factor, the existence of a conflict with foreign trademark law.

Totalplan also relies upon *George W. Luft Co. v. Zande Cosmetic Co.,* 142 F.2d 536 (2d Cir.), *cert. denied,* 323 U.S. 756, 65 S.Ct. 90, 89 L.Ed. 606 (1944), to bring appellees' conduct within the reach of the Lanham Act. *Luft* was decided prior to *Bulova* and the passage of the Lanham Act. However, the Court in *Bulova,* citing *Luft,* indicated that the Lanham Act did not constrict jurisdiction of the 1905 Trade–Mark Act as construed by courts, *see Bulova,* 344 U.S. at 286–87, 73 S.Ct. at 255–56, and therefore, we also consider whether *Luft* calls for application of the

Lanham Act in the instant case. In *Luft,* the plaintiff, who owned the registered trademark "Tangee" for cosmetics, sought to enjoin the defendant from selling cosmetics in the United States and abroad under the label "Zande." The district court granted a broad injunction prohibiting the defendant from using the name "Zande" in connection with the sale of cosmetics anywhere. *Luft,* 142 F.2d at 539.

■ On appeal, we concluded that the injunction had to be modified to differentiate between three categories of foreign countries: (1) countries where both parties marketed their goods and where defendant had established by local law the right to use its trade name, (2) countries where both parties marketed their goods and where the defendant had not established a right to use its trade name, and (3) countries where the defendant was doing business and "the plaintiff has not proved that it has ever done business or is likely to do it." *Id.* at 540. We held that the district court had no jurisdiction to enjoin the defendant from manufacturing products in the United States for sale in countries encompassed in the first and third categories. With respect to countries where both parties were marketing their goods and the defendant had not established a superior right to use its mark, we held that the district judge should enjoin the defendant's United States production. In the instant case, the district judge was not clearly erroneous in concluding that Totalplan had not proved that it marketed or was likely to market Love cameras in Japan and therefore this case falls within the third category. Consequently, *Luft* does not compel the extraterritorial application of the Lanham Act to appellees' conduct.[3]

### 3. Breach of Contract

Totalplan argues that the district judge erred in failing to find that appellees, by

---

**2.** Evidence of Totalplan's efforts to market in Iran is not probative of diverted sales, because there is no evidence that Lure ever entered the Iranian market.

**3.** Lure invoice number 3101 reflects a sale of Love cameras to Pro–West for shipment to Argentina. Totalplan has adduced no evidence that

it ever entered or planned to enter the Argentinean market or that appellees' shipment of cameras to Argentina had a substantial effect on United States commerce. A claim of infringement based on this invoice fails for the same reasons that the claim of Japanese infringement fails.

manufacturing and selling cameras to competitors of Totalplan, breached an oral contract, putatively formed in 1978, to grant Totalplan exclusive worldwide marketing rights to Lure's pocket camera. Appellees counter that Totalplan's breach of contract claim was barred by the judgment in the previous California state action. Alternatively, they argue that a contract providing Totalplan with worldwide marketing rights was never made, and if it was, it was breached by Totalplan's failure to post a letter of credit. We conclude that appellees have waived the defense of res judicata, but prevail on the merits because a contract respecting worldwide marketing rights was never agreed upon by the parties.

■ Appellees assert that Totalplan's breach of contract claim is barred by res judicata because it did or could have raised this claim in its cross-complaint filed in the California state action. *See Migra v. Warren City School District Board of Education,* 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984) (state court judgment has same preclusive effect in federal court as judgment would have had in state court). However, appellees raise this defense for the first time on appeal. Because res judicata is an affirmative defense, it should have been asserted as soon as it was available, at the latest in 1983 when the California judgment was entered. *See* Fed.R.Civ.P. 8(c). Appellees' failure to raise res judicata until appeal constitutes waiver of that defense. *Evans v. Syracuse City School Dist.,* 704 F.2d 44, 47 (2d Cir.1983) ("there could have been no doubt that res judicata should have been asserted timely if it was to be relied upon by defendant to preclude the present action in the federal courts"); *Kern Oil & Refining Co. v. Tenneco Oil Co.,* 840 F.2d 730, 735 (9th Cir.), *cert. denied,* 488 U.S. 948, 109 S.Ct. 378, 102 L.Ed.2d 367 (1988).

■ On the merits, we are first confronted with a choice of law question, an issue not addressed by either party. Totalplan relies on New York law for its substantive argument, and appellees cite to no case-law on the breach of contract issue. Because jurisdiction in this case is based on diversity of citizenship as well as the presence of a federal question, we follow the choice of law rules of New York, the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Bank of America v. Envases Venezolanos, S.A.,* 740 F.Supp. 260, 265 (S.D.N.Y.) (applying choice of law rules of forum where jurisdiction based on both diversity and federal question), *aff'd,* 923 F.2d 843 (2d Cir.1990). On substantive issues of law such as contract formation, New York courts give "controlling effect to the law of the jurisdiction which has the greatest concern with, or interest in, the specific issue raised in the litigation." *Intercontinental Mon. Corp. v. Performance Guar.,* 705 F.Supp. 144, 147 (S.D.N.Y.1989), (*quoting Neumeier v. Kuehner,* 31 N.Y.2d 121, 335 N.Y.S.2d 64, 69, 286 N.E.2d 454, 457 (1972)). The issue of whether the parties entered into a binding agreement to grant Totalplan worldwide marketing rights involves the interests of New York, California, and Canada. The parties resided within these fora during the relevant events, and the parties' obligations under the putative agreement were to be executed primarily through Totalplan's New York and California offices and Lure's California office. Where the interests of the fora are thus equally divided, one party has argued its position under New York law, and no claim of conflict has been made, we will apply New York law. *See Intercontinental Mon. Corp. v. Performance Guar.,* 705 F.Supp. at 147.

Totalplan offers several theories in its attempt to demonstrate that appellees breached an agreement to provide Totalplan with worldwide marketing rights to the pocket camera. Although Totalplan correctly notes that in New York a contract need not be reduced to writing to be effective "[w]here all the substantial terms of a contract have been agreed on, and there is nothing left for future settlement," the parties must express an intent to be bound prior to memorializing the agreement in writing. *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 74 (2d Cir.1984) (*quoting Municipal Consultants & Publishers, Inc. v. Town of Ramapo,* 47 N.Y.2d 144, 417 N.Y.S.2d 218, 220, 390 N.E.2d 1143, 1145 (1979)); *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 574 (2d Cir.1993).

■ Totalplan has not demonstrated that there was any agreement that Lure would be

bound to provide worldwide marketing rights. Although both parties took steps to effectuate some of the marketing plans contained in the drafts, the circulation of varying drafts throughout the spring of 1978 indicates that no binding agreement had been reached and the terms were still under negotiation. Furthermore, Totalplan never posted a letter of credit guaranteeing minimum purchases of cameras, as required by every draft agreement. One of the drafts, forwarded on April 20, 1978 by Lure Vice–President Harry Montgomery for review by Iannello, stated that Totalplan's minimum purchases of cameras, backed by a letter of credit, was "an essential condition of this contract." According to the district court, Iannello testified that he did not want to post the letters of credit until there was a signed contract. Totalplan's failure to post the letters of credit thus also indicates that there was no intent to be bound by all of the terms of the draft until a contract had been formally executed. In addition, in June 1978, Mikesell clearly conveyed by letter to John Papsidero, a director of Totalplan, that it was Lure's understanding that Lure had no commitment to supply Totalplan with cameras at a fixed price, or even to supply them at all. In light of this evidence, the district court's finding that "there is no evidence that any agreement under which [the parties] were operating granted Totalplan exclusive worldwide marketing rights" is not clearly erroneous.

Totalplan also argues that appellees were required to provide it with exclusive marketing rights under the doctrine of promissory estoppel. In New York, promissory estoppel may apply where there is "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance." *Esquire Radio & Electronics v. Montgomery Ward*, 804 F.2d 787, 793 (2d Cir.1986) (internal quotations and citation omitted). Totalplan cannot prevail on such a theory because it has failed to demonstrate that appellees made a clear and unambiguous promise to provide it with exclusive marketing rights. Although these rights were proposed in draft agreements, no agreement was ever reached.

## CONCLUSION

We reverse the dismissal of the domestic infringement claim and remand to the district court for clarification regarding invoice number 3149. In all other respects, the decision of the district court is affirmed.