Christopher SPECHT, John Gibson, Michael Fagan and Sean Kelly, individually and on behalf of all others similarly situated, Plaintiffs,

v.

NETSCAPE COMMUNICATIONS CORP. and AMERICA ONLINE, INC., Defendants.

Sherry Weindorf, individually and on behalf of all others similarly situated, Plaintiff,

v.

Netscape Communications Corp. and America Online, Inc., Defendants.

Mark Gruber, individually and on behalf of all others similarly situated, Plaintiff,

v.

Netscape Communications Corp. and America Online, Inc., Defendants.

Nos. 00 CIV. 4871(AKH), 00 CIV. 6219(AKH), 00 CIV. 6249(AKH).

United States District Court, S.D. New York.

July 5, 2001.

Joshua Neil Rubin, Jill S. Abrams, Courtney E. Lynch, Abbey, Gardy & Squitieri, L.L.P., New York City, for Christopher Specht, John Gibson and Michael Fagan.

James V. Bashian, Oren S. Giskan, Law Offices of James V. Bashian, P.C., New York City, for Sherry Weindorf.

George G. Mahfood, Leesfield, Leghton, Rubio & Mahfood, Miami, FL, for Mark Gruber.

Laurence D. Paskowitz, Abraham & Paskowitz, New York City, of counsel, for plaintiffs.

Roger W. Yoerges, Patrick J. Carome, Samir C. Jain, Joseph R. Profaizer, Matthew P. Previn, Darrin A. Hostetler, Wilmer, Cutler & Pickering, Washington, DC, for Netscape Communications Corp. and America Online, Inc.

*MEMORANDUM AND ORDER DENY-
ING MOTION TO COMPEL ARBI-
TRATION AND STAY PROCEED-
INGS*

HELLERSTEIN, District Judge.

Promises become binding when there is a meeting of the minds and consideration is exchanged. So it was at King's Bench in common law England; so it was under the common law in the American colonies; so it was through more than two centuries of jurisprudence in this country; and so it is today. Assent may be registered by a signature, a handshake, or a click of a computer mouse transmitted across the invisible ether of the Internet. Formality is not a requisite; any sign, symbol or action, or even willful inaction, as long as it is unequivocally referable to the promise, may create a contract.

The three related cases [1] before me all involve this timeless issue of assent, but in the context of free software offered on the Internet. If an offeree downloads free software, and the offeror seeks a contractual understanding limiting its uses and applications, under what circumstances does the act of downloading create a contract? On the facts presented here, is there the requisite assent and consideration? My decision focuses on these issues.

In these putative class actions, Plaintiffs allege that usage of the software transmits to Defendants private information about the user's file transfer activity on the Internet, thereby effecting an electronic surveillance of the user's activity in violation of two federal statutes, the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq.*, and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. Defendants move to compel arbitration and stay the proceedings, arguing that the disputes reflected in the Complaint, like all others relating to use of the software, are subject to a binding arbitration clause in the End User License Agreement ("License Agreement"), the contract allegedly made by the offeror of the software and the party effecting the download. Thus, I am asked to decide if an offer of a license agreement, made independently of freely offered software and not expressly accepted by a user of that software, nevertheless binds the user to an arbitration clause contained in the license.

## I. Factual and Procedural Background

Defendant Netscape,[2] a provider of computer software programs that enable and facilitate the use of the Internet, offers its "SmartDownload" software free of charge on its web site to all those who visit the site and indicate, by clicking their mouse in a designated box, that they wish to obtain it. SmartDownload is a program that makes it easier for its users to download files from the Internet without losing their interim progress when they pause to engage in some other task, or if their Internet connection is severed. Four of the six named Plaintiffs—John Gibson, Mark Gruber, Sean Kelly and Sherry Weindorf—selected and clicked in the box indicating a decision to obtain the software, and proceeded to download the software on to the hard drives of their computers. The fifth named Plaintiff, Michael Fagan, allegedly downloaded the software

---

1. While the cases have not been consolidated, all briefs and supporting materials on this motion, and my opinion deciding the motion, apply equally to all three cases. *See* Fed. R.Civ.P. 42(a).

2. Defendant American Online, Inc. ("AOL") is Defendant Netscape's corporate parent.

from a "shareware"[3] web site operated by a third party. The sixth named Plaintiff, Christopher Specht, never obtained or used SmartDownload, but merely maintained a web site from which other individuals could download files.[4]

Visitors wishing to obtain SmartDownload from Netscape's web site arrive at a page pertaining to the download of the software. On this page, there appears a tinted box, or button, labeled "Download." By clicking on the box, a visitor initiates the download. The sole reference on this page to the License Agreement appears in text that is visible only if a visitor scrolls down through the page to the next screen. If a visitor does so, he or she sees the following invitation to review the License Agreement:

Please review and agree to the terms of the *Netscape SmartDownload software license agreement* before downloading and using the software.

Visitors are not required affirmatively to indicate their assent to the License Agreement, or even to view the license agreement, before proceeding with a download of the software. But if a visitor chooses to click on the underlined text in the invitation, a hypertext link takes the visitor to a web page entitled "License & Support Agreements." The first paragraph on this page reads in pertinent part:

The use of each Netscape software product is governed by a license agreement.

You must read and agree to the license agreement terms BEFORE acquiring a product. Please click on the appropriate link below to review the current license agreement for the product of interest to you before acquisition. For products available for download, you must read and agree to the license agreement terms BEFORE you install the software. If you do not agree to the license terms, do not download, install or use the software.

Below the paragraph appears a list of license agreements, the first of which is *"License Agreement for Netscape Navigator and Netscape Communicator Product Family* (Netscape Navigator, Netscape Communicator and Netscape SmartDownload)." If the visitor then clicks on that text, he or she is brought to another web page, this one containing the full text of the License Agreement.

The License Agreement, which has been unchanged throughout the period that Netscape has made SmartDownload available to the public, grants the user a license to use and reproduce SmartDownload, and otherwise contains few restrictions on the use of the software. The first paragraph of the License Agreement describes, in upper case print, the purported manner in which a user accepts or rejects its terms.

BY CLICKING THE ACCEPTANCE BUTTON OR INSTALLING OR US-

---

3. Various companies and individuals maintain "shareware" web sites containing libraries of free, publicly available software. The ZDNet site library included SmartDownload. The pages that a user would see in downloading SmartDownload from ZDNet, however, differ from the pages that a user would see in downloading SmartDownload directly from the Netscape web site. Notably, there is no reference to the License Agreement on the ZDNet pages, merely a hypertext link to "more information" about SmartDownload, which, if clicked, takes the user to a Netscape web page which, in turn, contains a link to the License Agreement. In other words, an individual could obtain SmartDownload from ZDNet without ever seeing a reference to the License Agreement, even if he or she viewed all of ZDNet's web pages.

4. As discussed *infra*, Defendants contend that because other individuals could use SmartDownload to facilitate their downloading of files from Specht's web site, Specht is a third-party beneficiary of the License Agreement.

ING NETSCAPE COMMUNICATOR, NETSCAPE NAVIGATOR, OR NETSCAPE SMARTDOWNLOAD SOFTWARE (THE "PRODUCT"), THE INDIVIDUAL OR ENTITY LICENSING THE PRODUCT ("LICENSEE") IS CONSENTING TO BE BOUND BY AND IS BECOMING A PARTY TO THIS AGREEMENT. IF LICENSEE DOES NOT AGREE TO ALL OF THE TERMS OF THIS AGREEMENT, THE BUTTON INDICATING NON-ACCEPTANCE MUST BE SELECTED, AND LICENSEE MUST NOT INSTALL OR USE THE SOFTWARE.

The License Agreement also contains a term requiring that virtually all disputes be submitted to arbitration in Santa Clara County, California.

> Unless otherwise agreed in writing, all disputes relating to this Agreement (excepting any dispute relating to intellectual property rights) shall be subject to final and binding arbitration in Santa Clara County, California, under the auspices of JAMS/EndDispute, with the losing party paying all costs of arbitration.

All users of SmartDownload must use it in connection with Netscape's Internet browser, which may be obtained either as an independent product, Netscape Navigator, or as part of a suite of software, Netscape Communicator. Navigator and Communicator are governed by a single license agreement, which is identical to the License Agreement for SmartDownload. By its terms, the Navigator / Communicator license is limited to disputes "relating to this Agreement."

## II. Applicable Law

The Federal Arbitration Act expresses a policy strongly favoring the enforcement of arbitration clauses in contracts.

> A written provision in … a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The interpretation of an arbitration agreement is governed by the federal substantive law of arbitration. *See, e.g., In re Salomon Inc. Shareholders' Derivative Litigation,* 68 F.3d 554, 559 (2d Cir.1995) ("[W]e have long held that '[o]nce a dispute is covered by the [FAA], federal law applies to all questions of interpretation, construction, validity, revocability, and enforceability.'") (citation omitted).[5] On this basis, Defendants argue

---

**5.** *See also* 9 U.S.C. § 4 ("A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement…. The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed. If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof…. Where such an issue is raised, the party alleged to be in default may … demand a jury trial of such issue …. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement

that this motion properly is analyzed using the federal common law regarding the arbitrability of disputes, and that such federal common law "simply 'comprises generally accepted principles of contract law.'" *McPheeters v. McGinn, Smith & Co.*, 953 F.2d 771, 772 (2d Cir.1992) (citations omitted).

■ However, Defendants' approach elides the distinction between two separate analytical steps. First, I must determine whether the parties entered into a binding contract. Only if I conclude that a contract exists do I proceed to a second stage of analysis: interpretation of the arbitration clause and its applicability to the present case. The first stage of the analysis—whether a contract was formed—is a question of state law.[6] If, under the law, a contract is formed, the interpretation of the scope of an arbitration clause in the contract is a question of federal law.

■ In determining which state law to apply, I look first to the choice-of-law doctrine of the forum state, New York.[7] Under New York's choice-of-law rules, when determining which state's law to apply to a contract dispute, "the court evaluates the 'center of gravity' or 'grouping of contacts,' with the purpose of establishing which state has 'the most significant relationship to the transaction and the parties.'" *Fieger v. Pitney Bowes Credit*

for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof.").

6. To hold otherwise would lead to a nonsensical result. Consider two hypothetical cases, each involving an alleged contract to which the plaintiff claims never to have agreed. The putative contract in Case A contains an arbitration clause; the putative contract in Case B does not. Otherwise, the two cases are identical. The question before the court is whether a contract was formed. The analysis of that question, and its outcome, should be the same in both cases. However, were I to accept Defendant's reasoning, the analysis in Case A would be governed by federal law, while the analysis in Case B would be governed by state law. The results of the analyses therefore could differ despite the fact that all the particulars regarding contract formation are identical.

7. Plaintiff's claims arise under this Court's federal question jurisdiction. Hence, I would ordinarily refer to federal choice-of-law rules. *See, e.g., Wells Fargo Asia Ltd. v. Citibank N.A.*, 936 F.2d 723, 726 (2d Cir.1991) ("In federal question cases, we are directed to apply a federal common law choice of law rule to determine which jurisdiction's substantive law should apply."). However, my determination of the instant motion involves a question of state law: was a contract formed? Therefore, in determining which state's law to apply to this question, I find it appropriate to rely upon the forum state's choice-of-law rules rather than the federal choice-of-law rules. *Cf. Totalplan Corp. of America v. Colborne*, 14 F.3d 824, 832 (2d Cir.1994) ("Because jurisdiction in this case is based on diversity of citizenship as well as the presence of a federal question, we follow the choice of law rules of New York, the forum state."); *Barkanic v. CAAC*, 923 F.2d 957, 960–61 (2d Cir.1991) (federal court deciding federal question may apply state choice-of-law rules if it finds that doing so would best effectuate intent of Congress); *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir.1989) ("A federal court ... adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state.") (citing *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). This may be a distinction without a difference. The Second Circuit Court of Appeals has "discern[ed] no significant difference between the applicable federal and New York choice-of-law rules. The federal common law choice-of-law rule is to apply the law of the jurisdiction having the greatest interest in the litigation." *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 350 (2d Cir.1992). This formulation mirrors the New York "center of gravity" test, which also focuses on which state has the strongest connection to the litigation. *See infra.*

*Corp.,* 251 F.3d 386, 394 (2d Cir.2001) (*citing Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.,* 84 N.Y.2d 309, 618 N.Y.S.2d 609, 612, 642 N.E.2d 1065 (1994); *Restatement (Second) of Conflict of Laws* § 188(1)). The named Plaintiffs reside in various states, including Florida, Louisiana, and New Jersey. None of these states appears to have any other connection to the litigation. The product at issue—SmartDownload—was created by Netscape, a Delaware corporation with its principal offices in California. Plaintiffs argue in their motion papers that Smart-Download was designed in California and is distributed from Netscape's web site, which is maintained by employees at Netscape's California offices, to Internet users throughout the world. Netscape appears not to dispute these assertions. California necessarily has an interest in the enforceability of an arbitration clause pertaining to a product created in California by a California-based corporation. Likewise, California has an interest in whether a California-based corporation has created a product that violates federal privacy and electronic surveillance statutes. Although the record evidence on this point is sparse at best, no other state appears to have an interest of comparable strength. Therefore, I conclude that California has the most significant connection to the litigation, and I apply California law to the issue of contract formation.

By its terms, Article 2 of the Uniform Commercial Code "applies to transactions in goods." *See* Cal. Com.Code § 2102. The parties' relationship essentially is that of a seller and a purchaser of goods. Although in this case the product was provided free of charge,[8] the roles are essentially the same as when an individual uses the Internet to purchase software from a company: here, the Plaintiff requested Defendant's product by clicking on an icon marked "Download," and Defendant then tendered the product. Therefore, in determining whether the parties entered into a contract, I look to California law as it relates to the sale of goods, including the Uniform Commercial Code in effect in California.

### III. Did Plaintiffs Consent to Arbitration?

Unless the Plaintiffs agreed to the License Agreement, they cannot be bound by the arbitration clause contained therein. My inquiry, therefore, focuses on whether the Plaintiffs, through their acts or failures to act, manifested their assent to the terms of the License Agreement proposed by Defendant Netscape. More specifically, I must consider whether the web site gave Plaintiffs sufficient notice of the existence and terms of the License Agreement, and whether the act of downloading the software sufficiently manifested Plaintiffs' assent to be bound by the License Agreement. I will address separately the factually distinct circumstances of Plaintiffs Michael Fagan and Christopher Specht.

■ In order for a contract to become binding, both parties must assent to be

---

**8.** In order to form a contract, parties must exchange some consideration. "Among the limitations on the enforcement of promises, the most fundamental is the requirement of consideration." E. Allan Farnsworth, *Farnsworth on Contracts* § 2.2 (2d ed.2000). In general, "the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consider-ation." *Restatement (Second) of Contracts,* § 17. The apparent failure of consideration on Plaintiff's side—put simply, Plaintiff's obtaining SmartDownload without giving anything in return—might support a finding that no contract exists. However, because I rely on other grounds to find that the parties did not enter into a contract, *see infra,* I need not decide this issue.

bound. "[C]ourts have required that assent to the formation of a contract be manifested in some way, by words or other conduct, if it is to be effective." E. Allan Farnsworth, *Farnsworth on Contracts* § 3.1 (2d ed.2000). "To form a contract, a manifestation of mutual assent is necessary. Mutual assent may be manifested by written or spoken words, or by conduct." *Binder v. Aetna Life Ins. Co.,* 75 Cal.App.4th 832, 850, 89 Cal.Rptr.2d 540, 551 (Cal.Ct.App.1999) (citations omitted). "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Cal. Com.Code § 2204.

█ These principles enjoy continuing vitality in the realm of software licensing. The sale of software, in stores, by mail, and over the Internet, has resulted in several specialized forms of license agreements. For example, software commonly is packaged in a container or wrapper that advises the purchaser that the use of the software is subject to the terms of a license agreement contained inside the package. The license agreement generally explains that, if the purchaser does not wish to enter into a contract, he or she must return the product for a refund, and that failure to return it within a certain period will constitute assent to the license terms. These so-called "shrink-wrap licenses" have been the subject of considerable litigation.

In *ProCD, Inc. v. Zeidenberg,* for example, the Seventh Circuit Court of Appeals considered a software license agreement "encoded on the CD-ROM disks as well as printed in the manual, and which appears on a user's screen every time the software runs." 86 F.3d 1447, 1450 (7th Cir.1996). The absence of contract terms on the outside of the box containing the software was not material, since "[e]very box containing [the software] declares that the software comes with restrictions stated in an enclosed license." *Id.* The court accepted that placing all of the contract terms on the outside of the box would have been impractical, and held that the transaction, even though one "in which the exchange of money precedes the communication of detailed terms," was valid, in part because the software could not be used unless and until the offeree was shown the license and manifested his assent. *Id.* at 1451–52.

> A vendor, as master of the offer, may invite acceptance by conduct, and may propose limitations on the kind of conduct that constitutes acceptance. A buyer may accept by performing the acts the vendor proposes to treat as acceptance. And that is what happened. ProCD proposed a contract that a buyer would accept by using the software after having an opportunity to read the license at leisure. This Zeidenberg did. He had no choice, because the software splashed the license on the screen and *would not let him proceed without indicating acceptance.*

*Id.* at 1452 (emphasis added). The court concluded that "[s]hrinkwrap licenses are enforceable unless their terms are objectionable on grounds applicable to contracts in general (for example, if they violate a rule of positive law, or if they are unconscionable)." *Id.* at 1449.[9]

9. In a breach-of-warranty suit involving software, the Supreme Court of Washington, *en banc,* enforced a license agreement that, like the agreement at issue in *ProCD,* was presented on the user's computer screen each time the software was used, and also was located on the outside of each diskette pouch and on the inside cover of the instruction manuals. *See M.A. Mortenson Co., Inc. v. Timberline Software Corp.,* 140 Wash.2d 568, 998 P.2d 305 (Wash.2000).

The Seventh Circuit expanded this holding in *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147 (7th Cir.1997), *cert. denied*, 522 U.S. 808, 118 S.Ct. 47, 139 L.Ed.2d 13 (1997). In *Hill*, a customer ordered a computer by telephone; the computer arrived in a box also containing license terms, including an arbitration clause, "to govern unless the customer return[ed] the computer within 30 days." *Id.* at 1148. The customer was not required to view or expressly assent to these terms before using the computer. More than 30 days later, the customer brought suit based in part on Gateway's warranty in the license agreement, and Gateway petitioned to compel arbitration. The court held that the manufacturer, Gateway, "may invite acceptance by conduct," and that "[b]y keeping the computer beyond 30 days, the Hills accepted Gateway's offer, including .the arbitration clause." *Id.* at 1149, 1150.[10] Although not mentioned in the decision, the customer, by seeking to take advantage of the warranty provisions contained in the license agreement, thus could be fairly charged with the arbitration clause as well. It bears noting that unlike the plaintiffs in *Hill* and *Brower*, who grounded their claims on express warranties contained in the contracts, the Plaintiffs in this case base their claims on alleged privacy rights independent of the License Agreement for SmartDownload.

Not all courts to confront the issue have enforced shrink-wrap license agreements. In *Klocek v. Gateway, Inc.*, the court considered a standard shrink-wrap license agreement that was included in the box containing the computer ordered by the plaintiff. 104 F.Supp.2d 1332 (D.Kan.2000). The court held that Kansas and Missouri courts probably would not follow *Hill* or *ProCD*, *supra*. The court held that the computer purchaser was the offeror, and that the vendor accepted the purchaser's offer by shipping the computer in response to the offer. Under Section 2–207 of the Uniform Commercial Code,[11] the court held, the vendor's enclosure of the license agreement in the computer box constituted "[a] definite and seasonable expression of acceptance ... operat[ing] as an acceptance even though it state[d] terms additional to or different from those offered or agreed upon, unless acceptance [was] expressly made conditional on assent to the additional or different terms." *Id.* (quoting K.S.A. § 84–2–207). The court found that the vendor had not made acceptance of the license agreement a condition of the purchaser's acceptance of the computer, and that "the mere fact that Gateway shipped the goods with the terms attached did not communicate to plaintiff any unwillingness to proceed without plaintiff's agreement to the [license terms.]" *Id.* at 1340. Therefore, the court held, the plaintiff did not agree to the license terms and could not be compelled to arbitrate. *Id.* at 1341.

For most of the products it makes available over the Internet (but not Smart-Download), Netscape uses another common type of software license, one usually identified as "click-wrap" licensing. A click-wrap license presents the user with a message on his or her computer screen, requiring that the user manifest his or her assent to the terms of the license agree-

---

**10.** *See also Brower v. Gateway 2000, Inc.*, 246 A.D.2d 246, 676 N.Y.S.2d 569 (N.Y.App.Div. 1998) (in suit for breach of warranty, enforcing shrink-wrap license agreement identical to that in *Hill* ).

**11.** Although Section 2–207 of the Uniform Commercial Code, codified by Kansas at K.S.A. § 84–2–207, generally is invoked in a "battle of the forms," the *Klocek* court held that "nothing in [the] language [of Section 2–207] precludes application in a case which involves only one form." *Id.* at 1339.

ment by clicking on an icon.[12] The product cannot be obtained or used unless and until the icon is clicked. For example, when a user attempts to obtain Netscape's Communicator or Navigator, a web page appears containing the full text of the Communicator / Navigator license agreement. Plainly visible on the screen is the query, "Do you accept all the terms of the preceding license agreement? If so, click on the Yes button. If you select No, Setup will close." Below this text are three button or icons: one labeled "Back" and used to return to an earlier step of the download preparation; one labeled "No," which if clicked, terminates the download; and one labeled "Yes," which if clicked, allows the download to proceed. Unless the user clicks "Yes," indicating his or her assent to the license agreement, the user cannot obtain the software. The few courts that have had occasion to consider click-wrap contracts have held them to be valid and enforceable. *See, e.g., In re RealNetworks, Inc. Privacy Litigation,* No. 00C1366, 2000 WL 631341 (N.D.Ill. May 8, 2000); *Hotmail Corp. v. Van$ Money Pie, Inc.,* No. C 98–20064, 1998 WL 388389 (N.D.Cal. April 16, 1998).

A third type of software license, "browse-wrap," was considered by a California federal court in *Pollstar v. Gigmania Ltd.,* No. CIV–F–00–5671, 2000 WL 33266437 (E.D.Cal. Oct. 17, 2000). In *Pollstar,* the plaintiff's web page offered allegedly proprietary information. Notice of a license agreement appears on the plaintiff's web site. Clicking on the notice links the user to a separate web page containing the full text of the license agreement, which allegedly binds any user of the information on the site. However, the user is not required to click on an icon expressing assent to the license, or even view its terms, before proceeding to use the information on the site. The court referred to this arrangement as a "browse-wrap" license. The defendant allegedly copied proprietary information from the site. The plaintiff sued for breach of the license agreement, and the defendant moved to dismiss for lack of mutual assent sufficient to form a contract. The court, although denying the defendant's motion to dismiss, expressed concern about the enforceability of the browse-wrap license:

> Viewing the web site, the court agrees with the defendant that many visitors to the site may not be aware of the license agreement. Notice of the license agreement is provided by small gray text on a gray background.... No reported cases have ruled on the enforceability of a browse wrap license.... While the court agrees with [the defendant] that the user is not immediately confronted with the notice of the license agreement, this does not dispose of [the plaintiff's] breach of contract claim. The court hesitates to declare the invalidity and unenforceability of the browse wrap license agreement at this time.

*Id.* at \*5–6.[13]

The SmartDownload License Agreement in the case before me differs fundamental-

---

12. In this respect, click-wrap licensing is similar to the shrink-wrap license at issue in *ProCD, supra,* which appeared on the user's computer screen when the software was used and could not be bypassed until the user indicated acceptance of its terms. *See ProCD,* 86 F.3d at 1452.

13. Judge Barbara Jones of this Court considered a similar license arrangement in *Regis-* *ter.com v. Verio, Inc.,* 126 F.Supp.2d 238 (S.D.N.Y.2000) (Jones, J.). The plaintiff posted license terms on its web site, alongside a statement that "[b]y submitting this query [to the plaintiff's database], you agree to abide by these terms." *Id.* at 248. The court held that, "in light of this sentence at the end of Register.com's terms of use, there can be no question that by proceeding to submit a[ ]

ly from both click-wrap and shrink-wrap licensing, and resembles more the browse-wrap license of *Pollstar*. Where click-wrap license agreements and the shrink-wrap agreement at issue in *ProCD* require users to perform an affirmative action unambiguously expressing assent *before* they may use the software, that affirmative action is equivalent to an express declaration stating, "I assent to the terms and conditions of the license agreement" or something similar. For example, Netscape's Navigator will not function without a prior clicking of a box constituting assent. Netscape's SmartDownload, in contrast, allows a user to download and use the software without taking any action that plainly manifests assent to the terms of the associated license or indicates an understanding that a contract is being formed.

■ California courts carefully limit the circumstances under which a party may be bound to a contract. "[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious.... This principle of knowing consent applies with particular force to provisions for arbitration." *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal.App.3d 987, 993, 101 Cal.Rptr. 347 (Cal.Ct.App.1972). *Accord Lawrence v. Walzer & Gabrielson*, 207 Cal. App.3d 1501, 1507, 256 Cal.Rptr. 6 (Cal.Ct. App.1989); *Cory v. Golden State Bank*, 95 Cal.App.3d 360, 366, 157 Cal.Rptr. 538 (Cal.Ct.App.1979).

Netscape argues that the mere act of downloading indicates assent. However, downloading is hardly an unambiguous indication of assent. The primary purpose of downloading is to obtain a product, not to assent to an agreement. In contrast, clicking on an icon stating "I assent" has no meaning or purpose other than to indicate such assent. Netscape's failure to require users of SmartDownload to indicate assent to its license as a precondition to downloading and using its software is fatal to its argument that a contract has been formed.

Furthermore, unlike the user of Netscape Navigator or other click-wrap or shrink-wrap licensees, the individual obtaining SmartDownload is not made aware that he is entering into a contract. SmartDownload is available from Netscape's web site free of charge. Before downloading the software, the user need not view any license agreement terms or even any reference to a license agreement, and need not do anything to manifest assent to such a license agreement other than actually taking possession of the product. From the user's vantage point, SmartDownload could be analogized to a free neighborhood newspaper, readily obtained from a sidewalk box or supermarket counter without any exchange with a seller or vender. It is there for the taking.

The only hint that a contract is being formed is one small box of text referring to the license agreement, text that appears below the screen used for downloading and that a user need not even see before obtaining the product:

> Please review and agree to the terms of the *Netscape SmartDownload software license agreement* before downloading and using the software.

query, Verio manifested its assent to be bound by Register.com's terms of use, and a contract was formed and subsequently breached." *Id.* Judge Jones was applying New York law. *Id.* at 241. Here, I am applying California law.

But, whether under California or New York law, the promissee's assent to be bound is a required condition, and I find no such assent on the facts presented in this case.

Couched in the mild request, "Please review," this language reads as a mere invitation, not as a condition. The language does not indicate that a user *must* agree to the license terms before downloading and using the software. While clearer language appears in the License Agreement itself, the language of the invitation does not require the reading of those terms [14] or provide adequate notice either that a contract is being created or that the terms of the License Agreement will bind the user.

The case law on software licensing has not eroded the importance of assent in contract formation. Mutual assent is the bedrock of any agreement to which the law will give force. Defendants' position, if accepted, would so expand the definition of assent as to render it meaningless. Because the user Plaintiffs did not assent to the license agreement, they are not subject to the arbitration clause contained therein and cannot be compelled to arbitrate their claims against the Defendants.

■ Defendants further contend that even if the arbitration clause in the Smart-Download License Agreement is not binding, the license agreement applicable to Netscape Communicator and Navigator applies to this dispute. As discussed earlier, the Communicator and Navigator agreement is a conventional click-wrap contract; it prevents any use of the software unless and until the user clicks an icon stating his or her assent to the terms of the license. The agreement contains a clause requiring arbitration of "all disputes relating to this Agreement." Assuming *arguendo* that it is enforceable, the Communicator / Navigator license agreement is

a separate contract governing a separate transaction; it makes no mention of SmartDownload. Plaintiffs' allegations involve an aspect of SmartDownload that allegedly transmits private information about Plaintiffs' online activities to Defendants. These claims do not implicate Communicator or Navigator any more than they implicate the use of other software on Plaintiffs' computers. Resolution of this dispute does not require interpretation of the parties' rights or obligations under the license agreement for Netscape Communicator and Navigator. Defendants were free to craft broader language for the Communicator / Navigator license, explicitly making later applications such as SmartDownload subject to that click-wrap agreement. They did not do so. Therefore, I reject Defendants' argument that the arbitration clauses in the Communicator and Navigator license agreements mandate arbitration of this dispute.

## IV. Plaintiff Michael Fagan

■ Unlike most of his fellow Plaintiffs, Michael Fagan alleges that he obtained SmartDownload from a shareware web site established and managed by a third party. Defendants dispute Fagan's allegations, insisting that the record shows that he must have obtained SmartDownload from Netscape's web site in the same manner as the other Plaintiffs discussed above. I need not resolve this factual dispute. If Fagan in fact obtained SmartDownload from the Netscape site, his claims are equally subject to my earlier analysis. If, however, Fagan's version of events is accurate, his argument against arbitration is stronger than that of the other Plaintiffs. While

14. Defendants argue that this case resembles the situation where a party has failed to read a contract and is nevertheless bound by that contract. *See, e.g., Powers v. Dickson, Carlson & Campillo,* 54 Cal.App.4th 1102, 1109, 63 Cal.Rptr.2d 261 (Cal.Ct.App.1997); *Rowland v. PaineWebber Inc.,* 4 Cal.App.4th 279, 287, 6 Cal.Rptr.2d 20 (Cal.Ct.App.1992). This argument misses the point. The question before me is whether the parties have first bound themselves to the contract. If they have unequivocally agreed to be bound, the contract is enforceable whether or not they have read its terms.

Netscape's download page for SmartDownload contains a single brief and ambiguous reference to the License Agreement, with a link to the text of the agreement, the ZDNet site [15] contains not even such a reference. The site visitor is invited to click on a hypertext link to "more information" about SmartDownload. The link leads to a Netscape web page, which in turn contains a link to the License Agreement. Assuming, for the sake of argument, that Fagan obtained SmartDownload from ZDNet, he was even less likely than the other Plaintiffs to be aware that he was entering into a contract or what its terms might be, and even less likely to have assented to be bound by the License Agreement and its arbitration clause. Therefore, Plaintiff Michael Fagan cannot be compelled to arbitrate his claims.[16]

## V. Plaintiff Christopher Specht

 The connection between the sixth named Plaintiff, Christopher Specht, and the SmartDownload License Agreement is even more attenuated than the connection between Fagan and the Agreement. Specht never obtained or used Smart-Download. Defendants seek to compel arbitration on the basis that Specht maintained a web site from which others could download files, possibly by using SmartDownload, and therefore, Defendants argue, Specht became a third-party beneficiary of the License Agreement. The haziness of Specht's connection to SmartDownload might later prove fatal to his claims in this case; it certainly dooms Defendants' efforts to compel him to arbitrate those claims.

California courts will compel arbitration of the claims of a non-signatory to an arbitration agreement only in certain narrowly-defined circumstances:

The California cases binding nonsignatories to arbitrate their claims fall into two categories. In some cases, a nonsignatory was required to arbitrate a claim because a benefit was conferred on the nonsignatory as a result of the contract, making the nonsignatory a third party beneficiary of the arbitration agreement. In other cases, the nonsignatory was bound to arbitrate the dispute because a preexisting relationship existed between the nonsignatory and one of the parties to the arbitration agreement, making it equitable to compel the nonsignatory to also be bound to arbitrate his or her claim.

*County of Contra Costa v. Kaiser Foundation Health Plan, Inc.,* 47 Cal.App.4th 237, 242, 54 Cal.Rptr.2d 628 (Cal.Ct.App.1996). *See also NORCAL Mutual Ins. Co. v. Newton,* 84 Cal.App.4th 64, 76, 100 Cal. Rptr.2d 683 (Cal.Ct.App.2000) (In the absence of "an agency or similar relationship between the nonsignatory and one of the parties to an arbitration agreement ... courts have refused to hold nonsignatories to arbitration agreements."); *cf. American Bureau of Shipping v. Tencara Shipyard S.P.A.,* 170 F.3d 349, 353 (2d Cir. 1999) ("A party is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause."). The record is devoid of evidence that Specht has any preexisting relationship with Netscape, America Online, or the other Plaintiffs; certainly there is no indication that Specht was an agent for any party to the License Agreement, or vice versá. Nor is Specht a direct beneficiary of the License Agreement. Netscape contends that, because

---

**15.** *See* note 3, *supra.*

**16.** Netscape's acquiescence to the distribution of the SmartDownload software through shareware sites such as ZDNet—sites containing minimal or no reference to the License Agreement—demonstrates its indifference to obtaining users' assent to the terms of the License Agreement.

users of Specht's shareware site may use SmartDownload to obtain files from that site, Specht benefits—for example, Specht receives a commission from a company called WhyWeb for each time a user downloads WhyWeb's software from Specht's shareware site. However, Internet users could download Specht's files without ever using SmartDownload, or while using a download facilitator other than Smart-Download. The marginally reduced frustration enjoyed by users who obtain files from Specht's site using SmartDownload can hardly be said to provide a "direct benefit" to Specht. I decline to compel arbitration of Specht's claims.

## VI. Conclusion

For the reasons stated, I deny Defendants' motion to compel arbitration. The parties shall appear for a status conference on July 26, 2001 at 11:00 a.m., and shall prepare and bring to the conference a Civil Case Management Plan addressing, *inter alia*, a motion for class certification.

SO ORDERED.