517 F.2d 1158
 89 L.R.R.M. (BNA) 2492, 77 Lab.Cas. P 10,902
 PACIFIC MARITIME ASSOCIATION, Plaintiff-Appellee,
v.
INTERNATIONAL LONGSHOREMEN'S AND WAREHOUSEMEN'S UNION et
al., Defendants-Appellants.
PACIFIC MARITIME ASSOCIATION, Plaintiff-Appellee,
v.
INTERNATIONAL LONGSHOREMEN'S AND WAREHOUSEMEN'S UNION, LOCAL
19 et al., Defendants-Appellants.
 Nos. 73-1185, 72-3156 and 73-1284.
 United States Court of Appeals,
Ninth Circuit.
 May 21, 1975.
As Modified Aug. 18, 1975.
 
 Philip J. Poth (argued), Seattle, Wash., for defendants-appellants.
 J. Tyler Hull (argued), Seattle, Wash., for plaintiff-appellee.
 OPINION
 Before MERRILL, ELY and INGRAHAM,* Circuit Judges.
 MERRILL, Circuit Judge:
 
 
 1
 This case comes to us on appeals from orders of the district court entered in connection with appellee's action brought under 29 U.S.C. § 185 to enforce the decision of an arbitrator to whom a grievance had been submitted pursuant to collective bargaining contract.
 
 
 2
 Appellee, Pacific Maritime Association (PMA), is an association of steamship, stevedoring and terminal employers on the Pacific Coast that acts as representative for its members in negotiating and administering collective bargaining agreements. The International Longshoremen's and Warehousemen's Union (ILWU) represents its longshore locals in collective bargaining in California, Oregon and Washington. PMA and ILWU have negotiated a contract relating to the employment by PMA members of longshoremen, which contract is known as Pacific Coast Longshore Contract Document (PCLCD).
 
 
 3
 Container Stevedoring Co., Inc., is engaged in the business of loading and unloading vessels and has contracted with Sea-Land Service, Inc. to act in conjunction with that company respecting such matters. Both Container and Sea-Land are members of PMA. Longshoremen employed by Container in Seattle are members of Local 19 of ILWU.
 
 
 4
 Prior to July 23, 1972, Container obtained its crane operators at the Port of Seattle from the hiring hall operated jointly by PMA and Local 19 which dispatched operators on a rotational basis. Beginning July 23, 1972, Container commenced using four "steady men" as crane operators. These were members of Local 19 but were employed on a "steady" basis rather than on a rotational basis through the hiring hall. There is no dispute as to Container's right under PCLCD to use steady men in this fashion.
 
 
 5
 As soon as the steady men commenced work the other longshore employees of Container who were members of Local 19 engaged in a slowdown that so drastically curtailed work production that Container and Sea-Land were unable to meet commitments to customers and were compelled to transfer loading and unloading operations from Seattle to Tacoma.
 
 
 6
 Pursuant to PCLCD, PMA on behalf of Container and Sea-Land processed formal complaints through the grievance and arbitration procedures specified in the contract. This proceeded through the Area Arbitrator to the Coast Arbitrator, Sam Kagel, whose decisions under PCLCD are "final and conclusive."
 
 
 7
 PCLCD § 11.1 provides that there shall be no "strike, lockout or work stoppage" for the life of the contract. PMA contended that the slowdown violated this provision. The unions contended: (1) there was no slowdown; (2) even if there was, it did not constitute a strike or work stoppage under § 11.1; (3) even if it did, Local 19 had not called it, had nothing to do with it and was not responsible for it.
 
 
 8
 On August 25, 1972, arbitrator Kagel ruled against the unions on all points. He defined slowdown as a "concerted and deliberate effort by employees to reduce output and efficiency in order to obtain concessions from the employer." He ruled that this was a modified form of strike and was prohibited by § 11.1. He found that there was such a slowdown.
 
 
 9
 Section 11.2 of PCLCD provides: "The Union or the Employers, as the case may be, shall be required to secure observance of this agreement." Arbitrator Kagel construed this to mean that the unions "must act to stop and prevent" the slowdown, and "had the duty and responsibility to stop the slowdown."
 
 
 10
 We accept this as an authoritative construction of the contract and of the unions' obligations under it and as establishing that the conduct of the employees constituted a contract violation that the unions were obligated to prevent and stop.
 
 
 11
 On receiving this decision Container returned to the Port of Seattle. However, the decision seemed only to inspire the longshore employees to further slowdown efforts. Production remained low. Another grievance was processed by PMA and an interim decision favorable to Container was rendered by the Area Arbitrator on September 6, 1972. The slowdown nevertheless continued.
 
 
 12
 At this point, without proceeding to final processing of the second grievance, PMA brought this action to obtain judicial enforcement of the August 25, 1972, decision of Coast Arbitrator Kagel. The district court entered a temporary restraining order directing Local 19 and its members to cease and desist from engaging in slowdown. Following notice and hearing this was duly superseded by a preliminary injunction. The slowdown, however, had continued unabated and on petition of PMA, following hearing and court findings, Local 19 was held in contempt for disregard of order and injunction. Appeals from preliminary injunction and from orders holding in contempt have been consolidated.
 
 
 13
 Appellants contend that the Kagel decision disposed only of the issue as to whether conduct prior to August 25, 1972, constituted a slowdown. They contend that the court could not, without first submitting the question to arbitration, determine whether conduct after August 25, 1972, constituted a continuation of the slowdown. They point out that the decision of the Area Arbitrator on September 6, 1972, that this subsequent conduct constituted a slowdown was not final since matters had not proceeded to the Coast Arbitrator; thus there has been no final decision as to that matter.
 
 
 14
 Suit, however, was to enforce the Kagel decision of August 25, 1972. The second grievance was surplusage. PMA asserts that it was filed with the hope that it would solve the dispute expeditiously and render resort to the courts unnecessary; that when it became evident that this would not be the result, the grievance was abandoned. This course was a perfectly proper one.
 
 
 15
 Appellants next contend that the Kagel decision is too vague to be susceptible of enforcement in that it does not tell the unions what they must do or must not do. Two separate questions seem to be presented: (1) whether the slowdown to which the award is directed is itself sufficiently delineated so that the employees are told just what it is that they must do or refrain from doing; (2) if so, how the local is to go about its task of securing observance.
 
 
 16
 We agree with PMA that as to the second question the unions do not need to be told by anyone how to go about the business of securing observance from their members. The first question, however, deserves discussion.
 
 
 17
 The very term "slowdown" sounds in a comparative sense (work is being done more slowly than should be the case) and seems to call for a standard to which the production rate can be compared. The Kagel decision makes reference to production "which can be considered within normal ranges," but it does not specify the level that would provide satisfaction. If all that was decided was that the employees were not working fast enough, it is arguable that without saying how much faster they should be working the decision would not be enforceable.
 
 
 18
 But it was not in those terms that slowdown was defined by the Arbitrator. It was defined as a "concerted and deliberate effort by employees to reduce output and efficiency." Such can be established not only by reference to a rate of production but by proof of acts certain to have that effect and lacking in apparent legitimate purpose. The district court expressly found that such acts were taken after August 25, 1972.[1]
 
 
 19
 Appellants complain that the court order and injunction should have spelled out the specific acts that were prohibited and thus were invalid for failure to meet the requirements of Federal Rules of Civil Procedure 65(d).[2] PMA responds that it would be "completely impractical * * * to attempt to enumerate each and every device which could be used in a slowdown to restrict production."
 
 
 20
 The question is not how the unions are to keep their recalcitrant members in line. The unions by contract have assumed the responsibility for securing necessary action by their members and, as we have already noted, need no instruction from the court on such matters. The question instead is whether the employees were clearly told just what it was that they were to refrain from doing. In this respect both the Kagel decision and the court orders speak with utmost clarity. See United States v. Robinson, 449 F.2d 925, 928 n. 6, 929 (9th Cir. 1971). The employees were to stop all deliberate efforts to reduce output and efficiency no matter what form those efforts might take.[3] The crucial question was not as to kind of action taken but as to its effect and purpose.
 
 
 21
 The court found that appellants Maloney, Mink and Anderson, officers of Local 19, were not in contempt during the period of September 30 to October 4 because they had taken such action to stop the slowdown as their political position within Local 19 seemed, from a practical point of view, to permit. Local 19 contends that it was improper to hold it guilty of contempt when its officers were not found guilty of contempt. Local 19, however, had assumed responsibility for the actions of its members, and this was the basis for the adjudication of contempt. As to its officers the question is whether the sanctions of contempt were also to be invoked against them. Upon this question the court has wide discretion. Here it found grounds for clemency in dealing with the officers that it felt did not apply to the union. We find no basis for a holding of abuse of discretion.
 
 
 22
 We conclude that the Kagel decision was enforceable; that the temporary restraining order and preliminary injunction were sufficiently specific to satisfy the requirements of Rule 65(d), Federal Rules of Civil Procedure, and to form the basis for an adjudication of contempt; that the judgment of contempt against Local 19 was proper.
 
 
 23
 Judgment affirmed.
 
 
 
 *
 Honorable Joe McDonald Ingraham, Senior Judge, United States Court of Appeals for the Fifth Circuit, sitting by designation
 
 
 [1]
 The court found in part:
 "Sabotage of the Container Stevedoring Co. operation at Terminal 5 occurred, particularly on the night of September 8, 1972, and on September 9 and 10, 1972, in the form of extensive and deliberate damage to a crane and tractors being used by Container Stevedoring Co. in its loading and discharging operations. This damage was of such a nature and occurred under such circumstances, not caused by negligence or ordinary wear and tear, that it could only be attributed to deliberate action by longshoremen members of Local 19 employed by Container Stevedoring Co. * * *
 The testimony establishes clearly and convincingly that low production at the Container Stevedoring Co. operation at Terminal 5 was caused during the period from September 8, 1972, through the day shift on September 14, 1972, by the following types of activities engaged in by members of defendant Local 19 who were employed there as longshoremen: driving cranes in an exaggerated arc; driving cranes at abnormally low speeds; driving tractors at abnormally low and sometimes minimal idling speeds; misparking containers in the storage yard; driving tractors in unnecessarily circuitous routes in the storage yard while picking up or parking containers; failing to drive tractors under the cranes in the normal fashion until specifically directed to do so; driving tractors too far forward under the cranes and requiring specific directions to back into normal position; jockeying tractors into awkward positions under the cranes making it more difficult for the cranes to engage the container or land the container; and delaying excessively in the yard in picking up or parking containers.
 * * * In addition, the testimony establishes that longshoremen members of Local 19 engaged in the following activities: on the night shift on September 18, 1972, tractor drivers parked refrigerated vans containing perishable cargo at locations in the yard where there were no electrical outlets available to insure continued refrigeration of the cargo in the container; and tractor drivers parked containers which were to be restowed aboard vessels at points in the yard other than those designated making it difficult to locate them when the time came for the tractor drivers to pick them up and deliver them to the vessel for reloading.
 (a) On the night shift on September 30, 1972, tractor drivers were pulling their tractors too far forward under the cranes and required specific directions to move back into normal position; one crane operator sat in the wrong cab of a ship's crane for approximately one-half hour claiming he had no power thus delaying the operation; a tractor driver made an elaborate show for 15 minutes of cleaning the windshield of his tractor.
 (b) On October 1, 1972, during day shift, although two gangs of longshoremen operated normally, crane operators in three gangs drove the cranes in an exaggerated arc, drove the cranes slowly, and made unnecessary repeated efforts to land the cranes' spreader bars on the containers; tractor drivers again held back before driving to the cranes and required specific instructions to do so. During the night shift, tractor drivers were driving at a slower than normal pace, were not proceeding to drive under the cranes until specifically directed, and were driving past the normal position under the crane, requiring further movement to back under the crane; two tractors were observed with burned-out starters which could only have been caused by engaging the starters while the engines were running."
 
 
 [2]
 The court ordered Local 19 and its members "to do each of the following:
 (a) To cease and desist from engaging in a slowdown with respect to Container Stevedoring Co., Inc. or inducing, encouraging, or causing such a slowdown;
 (b) To take all necessary action to stop any slowdown with respect to Container Stevedoring Co., Inc. including ordering longshoremen employed by Container Stevedoring Co., Inc. to cease and desist from engaging in any slowdown;
 (c) To cease and desist from using any coercion to nullify the right of Container Stevedoring Co., Inc. to use steady men or inducing, encouraging or causing such coercion; and
 (d) To take all necessary action to stop any coercion of the nature specified in paragraph (c) above."
 
 
 [3]
 This case is thus unlike Schmidt v. Lessard, 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974), or International Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n, 389 U.S. 64, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967). In Schmidt the order and earlier opinion did no more than bar enforcement of "the present Wisconsin scheme" of involuntary commitment under that state's mental health act against a class. In Local 1291 an arbitrator's award stated a legal conclusion as to the meaning of a collective bargaining agreement but made no specific directions for further action